### PEEPLES *et al. v.* BYRD.

1. The law requires the reporter of the Supreme Court to advertise for bids for the printing and binding of the Supreme Court reports, and gives him the power, with the consent and approval of the Governor, to award the contract for the publication of these reports. In making such award, the Governor and the reporter are invested with a very broad discretion. They are not "limited to the lowest bidder, but may take into consideration the responsibility of such bidder, and his capacity and ability to perform such contract, in all cases making such award as will promote the best interests of the State and secure the cheapest and most prompt and efficient performance of said contract." They may reject any and all bids, especially where the advertisement for the same distinctly reserves the right to do so.

2. Such contract may, within reasonable limits, be awarded for the publication of more than one volume; but the number of volumes to be embraced in the contract should be specified in the advertisement calling for bids.

3. Where bids were advertised for pursuant to law, several were made and all rejected; and the reporter, with the approval and consent of the Governor, thereupon awarded the contract to a competent and qualified contractor who made no bid at all, but at the price named in the lowest of the bids submitted, this was a substantial compliance with the requirements of the law; and the lowest bidder whose bid had been rejected did not, because of a supposed right to have the contract awarded to him, have any legal cause of complaint as to the action taken in the premises by the Governor and the reporter.

4. No citizen or taxpayer, as such, has the right to institute in his own name an equitable petition against the reporter and the person with whom he, under the Governor's approval, has made a contract to publish the Supreme Court reports, for the purpose of testing the legality of that contract or of interfering with the carrying out of the same; because the State, being a party to the contract, would be a necessary party to the case, and as it cannot be subjected to an action of any kind without its own express consent, such a petition cannot be maintained. Even if the State was not an essential party, or if it could be made a party, a proceeding of the nature indicated would not lie at the instance of a taxpayer who was in no wise injured, as such. If in any given instance the public interest should require the annulling or cancellation of such a contract, for illegality or any other sufficient cause, the proper proceeding for

this purpose can, and ought to, be instituted by the attorney-general.

April 18, 1896.

Injunction.     Before Judge Gober.     Fulton county. March 7, 1896.

*Harrison & Peeples*, for plaintiffs in error.
*Anderson, Felder & Davis*, contra.

LUMPKIN, Justice.

The reporter of this court published a notice that bids would be received by him up to the 25th of November, 1895, for the printing, binding and electrotyping of the reports of the Supreme Court of Georgia, reserving the right to reject any and all bids, and also the right to contract for one or more volumes.     Several bids were submitted, the lowest of which was made by C. P. Byrd.     Subsequently, all the bids were rejected, and the contract for publishing five volumes of the reports, from 96 to 100 inclusive, was on December 31st, 1895, awarded by the reporter, with approval and consent of the Governor, to the Franklin Printing & Publishing Co., which had made no bid at all, but at the price named in Byrd's bid.     The latter sought, by *mandamus*, to compel the awarding of the contract to himself, and also to enjoin the reporter and the Franklin Company from carrying out the contract which had been awarded to it; prayers for both of the above mentioned remedies being embraced in the same petition.     At the hearing of the same, the trial judge refused the *mandamus*, but granted an order enjoining "the parties to the contract of December 31st, 1895. . . . from the execution of said contract, as prayed."     This order was subsequently amended by providing that it should have no application to the 96th volume of the reports.     The reporter and the Franklin Company excepted to the granting of the injunction, and brought the case to this court for review.

It is not now necessary to decide whether or not the two

remedies above mentioned could be properly applied for in the same petition. We shall simply deal with the case as presented, without determining this question.

1. By the act of August 23d, 1879, the office of public printer was abolished, and it was declared that after the expiration of the then existing term of the incumbent of that office, the public printing of the State should be let to the lowest bidder, or bidders; the secretary of State, the comptroller-general, and the treasurer, as commissioners, to advertise for sealed proposals to do the public printing. Acts of 1878-9, p. 37; Code, §1040(a) *et seq.* On October 20th of the same year, the General Assembly passed an act to regulate the publication and sale of the Supreme Court reports, etc., and it provided that the printing and binding of these reports should be done upon the terms and in the manner that other State printing was done. Acts of 1878-9, p. 158; Code, §228(c). Then came the act of September 26, 1883, "to regulate the publication of the Supreme Court reports, and for other purposes," the second section of which provides: "That the reporter of the Supreme Court, with the consent and approval of the Governor, shall have power to award the contract for the publication of the Supreme Court reports in the same general manner as the contract for other public printing is now awarded, but in making such award, the said Governor and the reporter shall not be limited to the lowest bidder, but may take into consideration the responsibility of such bidder, and his capacity and ability to perform such contract, in all cases making such award as will promote the best interests of the State and secure the cheapest and most prompt and efficient performance of said contract." Acts of 1882-3, p. 77.

In view of the above recited legislation, we have no difficulty in reaching the conclusion that it is the duty of the Supreme Court reporter to advertise for bids for the printing and binding of the Supreme Court reports. As will

have been seen, the act last cited provides that the contract shall be awarded "in the same general manner as the contract for other public printing," and the existing law relating to "other public printing" manifestly required that bids for doing the work should be called for by public advertisement. It will be observed, however, that the second section of the act of 1883 distinctly declares that the Governor and the reporter shall not be limited to the lowest bidder, and confers upon them a very broad discretion in this regard, the scope and extent of which was sufficiently apparent from the language of the statute. Undoubtedly, then, it is their right, under the law, to reject any and all bids. The advertisement published in the present instance distinctly reserved this right; and we are therefore decidedly of the opinion that their authority to exercise it was beyond question.

2. We see no good reason why the reporter, with the consent and approval of the Governor, may not, within reasonable and proper limits, award a contract for the publication of more than one volume of the reports. It is not to be supposed that these officials will abuse the discretion conferred upon them by law, by letting out a contract for so large a number of volumes as would, in effect, create a monopoly or deprive the State of the benefit which might accrue from a decline in prices for work of this kind. With reference to this matter, the chief executive and the reporter may safely be trusted, we think, to look well to the interests of the State. At any rate, the General Assembly were evidently of the opinion that they were entitled to confidence in attending to this business. At the same time, there is a manifest advantage to the State in allowing the contract to embrace more than one volume, for the simple reason that a contractor could well afford to bid lower and do the work cheaper upon a large job than upon a small one.

3. In awarding the contract to the Franklin Company at

the price named in Byrd's bid, though this company had it-self submitted no bid at all, the Governor and the reporter substantially complied with the requirements of the law. There was no question but that this company was fully competent and qualified to do the work in a satisfactory manner.    The Governor and the reporter were authorized to make such an award as, in their judgment, would "pro-mote the best interests of the State"; and not being bound to accept the lowest bid tendered, they had express author-ity of law to pursue the course which they believed would secure the end indicated in the language last quoted.    What they actually did is sustained by the principle ruled in *Crabtree et al.* v. *Gibson*, 78 *Ga.* 230.    It appears in that case that the ordinary had advertised for bids for the build-ing of a county bridge, and finally, without readvertising, awarded the contract to one who was not the lowest bidder. The point was made that the ordinary did not have the power to accept any bid other than the lowest, without read-vertisement.    The Supreme Court made no distinct ruling upon this point, but held squarely that, even if the ordi-nary did not have such power, it was within his authority "to have the bridge built at the price at which the lowest bidder had offered to build it."    It results as a logical sequence from the foregoing, that Byrd had no shadow of right to have the contract awarded him; and therefore, in his attitude as a disappointed bidder, he had no legal cause of complaint with reference to the action taken in the premises by the Governor and the reporter.    Statutes re-quiring the letting of contracts to the lowest bidder are designed for the benefit and protection of the public, and not that of the bidders, and do not confer upon the latter a right to enforce, for their benefit, the letting of a con-tract after it has already been awarded to another.    High's Extra. Legal Rem. (3d ed.) §92.    After public officers who are entrusted with the duty of awarding contracts for the benefit of the State "to the person whose offer shall be

most advantageous to the State" have finally made an award, they have no further authority in the matter, and cannot be compelled to enter into another contract for the same services. *Ibid.* §93. In section 94 of the same work, it is said: "The authorities cited in support of the preceding sections leave no room for doubt as to the settled rule, that the lowest bidder acquires no such right by making his bid as to entitle him to the writ of *mandamus* before the contract has actually been awarded him. The power conferred upon boards or officers authorized to contract with the lowest bidder necessarily involving the exercise of discretion, the general principle denying relief by *mandamus* to control the discretionary powers of public officers applies, and the courts refuse to interfere." Where "a matter is left to the discretion of any individual or body of men who are to decide according to their own conscience and judgment, it would be absurd to say that any other tribunal is to inquire into the grounds and reasons on which they have decided, and whether they have exercised their discretion properly or not." Heard's Shortt Extra. Rem. *260. See, also, People *ex rel.* Yates *v.* Canal Board of the City of New York, 13 Barb. 432.

4. The only remaining question is:  Did Byrd, in his capacity as a citizen and taxpayer, have the right to institute in his own name an equitable proceeding against the reporter and the Franklin Company for the purpose of testing the legality of the contract which the reporter, with the Governor's consent and approval, had made with that company, or of obtaining an injunction preventing such contract from being carried into effect? He could not do this, for several reasons. In the first place, the State, being a party to the contract, would be a necessary party to such a case; and it could not, without its own express consent, be subjected to an action of any kind. It is hardly necessary to cite authority for the proposition that a sovereign State is not liable to suit at the instance of a citizen, unless per-

mission to sue has been expressly granted. It is true that in the case of *Wright, comptroller-general,* v. *Southwestern Railroad Co.,* 64 *Ga.* 795, it was held that an injunction would lie against mere ministerial officers who were seeking illegally to enforce a process against the property of the railroad company; but that case differs essentially from the case at bar, for, in the present instance, no officer of the State is in any manner attempting to interfere with Byrd or his property. A contract to which the State is a party cannot be annulled without having the State before the court; and as Byrd could not make the State a party to his proceeding, this would be sufficient to end the matter.

But, secondly, the injunction granted necessarily operates against the Governor of the State; not *eo nomine,* because he is not a party to the record, but practically, because it suspends the operation of a contract which he participated officially in making. In *Mayo* v. *Renfroe,* 66 *Ga.* 427, this court said: "The Governor could not be made a party—being the head of a co-ordinate branch of the government, the courts may not well enjoin him— equity, as well as law, would seem to forbid it. The process of the courts is directed to the subordinate officers of the executive and those agents who are illegally using the authority of the State to oppress the citizens." This accords with the universal trend of authority as to cases in which an executive function involves the exercise of judgment and discretion as distinguished from mere ministerial action. "With respect to the power of the courts to control the action of the Governor of a State, many cases have arisen thereupon. It is entirely clear that the executive of a State is not subject to control from the courts, with respect to the exercise of his political powers, or his powers in any other matter, where his action is left to be guided by his own judgment and discretion." Throop, Pub. Off. §795. The same doctrine is, in effect, laid down in 2 High on Inj. §1326, from which we make the following

extract: "Delicate and interesting questions have fre-
quently arisen touching the extent to which the judiciary
may interfere with the executive department of the govern-
ment, either state or national, and the jurisdiction of equity
to enjoin the acts of officers whose duties partake of an
executive or *quasi* executive character. The true test in all
such cases is as to the nature of the specific act in question,
rather than as to the general functions and duties of the
officer. If the act which it is sought to enjoin is executive
instead of ministerial in its character, or if it involves the
exercise of judgment and discretion upon the part of the
officer, as distinguished from a merely ministerial duty, its
performance will not be prevented by injunction."

And, thirdly, even if obstacles above pointed out were
not in Byrd's way, he was not, as a mere taxpayer, entitled
to maintain his petition, because he utterly failed to show
that, as such, he was in any way injured by the letting of
the contract to the Franklin Company. It was, in any
event, absolutely essential for him to show that, in conse-
quence of the action taken by the Governor and the re-
porter, he, as a private citizen, sustained some injury. It
is difficult to conceive how, in this capacity, he could have
been injured at all, except by an increase in the amount of
his State taxes; and as to this, there was no contention—
nor even a pretense—that the publication of the Supreme
Court reports by the Franklin Company would cost the
State a single cent more than would have been the case if
the contract had been awarded to Byrd himself or to some
one else. He was not in a position to insist, and did not
insist, that the State could, in any event, get the work done
at a price less than his own bid.

It has been held that one not an owner of real estate, and
therefore not liable to a tax upon realty, would not be al-
lowed the aid of an injunction to prevent the enforcement
of such a tax, because he had no interest in the matter.
1 High on Inj. §573. Again, one seeking to enjoin a pub-

lic nuisance must show some special injury peculiar to himself and independent of the general injury to the public. *Ibid.* §762. Taxpayers of a city, in the absence of any special or personal interest in the matter, are not entitled to invoke equitable relief against misconduct on the part of the municipal authorities. See 2 High on Inj. §1301; Roosevelt *v.* Draper, 25 N. Y. 318. "He who seeks to restrain improper or unlawful conduct on the part of public officers must allege sufficient facts to show that he has such an interest in the public welfare as to make him a proper party to prevent the commission of a public wrong. It will generally suffice that the persons seeking the injunction are residents and taxpayers. . . But to warrant the relief in behalf of citizens and taxpayers against acts of public officers, it should be shown that plaintiff's rights will be greatly and irreparably injured by the acts which it is sought to enjoin, and unless this is shown the relief will be denied." 2 High on Inj. §1321. "It may be premised, generally, that the jurisdiction will be exercised only in behalf of parties interested in the transaction or subject-matter of the proceedings which it is sought to enjoin, and that one who has no personal interest in the matter is not entitled to the relief, even though he may have been a party to the proceedings at law which he seeks to restrain." *Ibid.* §1547. See, also, Throop on Pub. Off. §§549 and 816. "And to sustain an action by a private individual against a public officer, it must not only appear that the duty violated was one owing to individuals, but the individual suing must show some reason why he singles himself out as the party injured. In other words, he must show that he, as distinguished from individuals in general, has suffered some special and peculiar injury from the wrongful act of which he complains." Mechem's Pub. Offices & Off. §600.

The doctrine thus laid down by the text-writers is supported by Sherman *v.* Billows (Ore.), 34 Pac. Rep. 549. And, without searching for other decisions of this court, we

have before us at the moment that of *Reid* v. *Mayor &c. of Eatonton*, 80 *Ga.* 755, the principle of which is likewise applicable, it being there held that a taxpayer of a town had no right to call in question the constitutionality of an act authorizing an issue of bonds, when in his petition he entirely failed to allege any damage or injury that would accrue to him by reason of the issuance and sale of such bonds. We will not further prolong this discussion. Unless the conclusions we have reached are correct, any taxpayer of the State could set himself up as the *censor morum* of the Governor and other public officers of the State, and undertake to supervise their official action as to matters in which he had no personal interest whatsoever.

As already intimated, it is to be presumed that the State's officers will take the proper care of her interests as to affairs with the disposition of which they are specially entrusted. If in any given instance, through inadvertence or an omission to observe legal requirements, an unlawful or improper contract has been made in behalf of the State, resulting to her disadvantage, it can be set aside at her instance upon proper proceedings instituted for the purpose by the attorney-general. 10 Am. & Eng. Enc. of Law, p. 798.

We have omitted to mention some minor points, for the reason that the case is absolutely controlled by the principles which we have endeavored to discuss. The court was right in refusing the *mandamus*, but erred in granting the injunction.                    *Judgment reversed.*