Thomson, P. J.
This action was brought by the appellant as a citizen and taxpayer of Colorado to restrain the appellees, a commission created by statute, from awarding a contract to The Mills Publishing Company for the publication and sale of the reports of the opinions .of the court of appeals, and to compel them to award the contract to The Banks Law Publishing Company. A demurrer was interposed to the complaint, on the ground, among others, that the complaint did not state facts sufficient to constitute a cause of action. The demurrer was sustained, and, the plaintiff declining to amend, judgment was entered for the defendants. The plaintiff appeals.
The complaint, after stating that the plaintiff was a citizen and taxpayer, and the defendants, respectively, governor, secretary of state and attorney general, of the state of Colorado, set forth an advertisement by the defendant Mills as secretary of state, inviting proposals for the publication of the reports of the court of appeals for the period of ten years, to be opened on a day named by the defendants as a commission constituted for the purpose, in the presence of the bidders. It was then alleged that on the date specified the defendants met for the purpose of considering the proposals submitted, of which there were a number, including one of The Mills Publishing Company, at $1.39 per volume,-and one of The Banks Law Publishing Company, at $1.24 per volume; that the proposal of The Banks Law Publishing Company was in accordance with the terms of the contract provided by statute to be made; that it offered a lower rate .for the publication of the *359 reports than any of the' bids; that its terms were the most advantageous to the state and the public; that The Banks Law Publishing Company was entirely reliable and responsible; that it' had for a long time previously published the reports of the supreme court, and the court of appeals of Colorado, and that its reliability and responsibility were not questioned by the defendants; that The Mills Publishing Company did not propose, to print the reports in accordance with the terms of the contract as provided by statute, in that it contained a statement that if the contract should he awarded to it, the work would be done within the state, and by union labor; that notwithstanding the hid of The Banks Law Publishing Company was the lowest, the defendants awarded the contract to The Mills Publishing Company; and that in so doing they were influenced by the statement in that company’s proposal that if the contract should be awarded to it, the work would be done within the state and by union labor.
The proposals were invited pursuant to the provisions of an act in relation to supreme court reports, approved March 17, 1891 (Session Laws 1891, pp. 369-372), of which the following sections are the only ones necessary to he considered in the discussion of the questions which are raised:
“Section 1. That the opinions of the supreme court of the state of Colorado shall be published in volumes of the size, as nearly as may be, of volumes one, two and three of Colorado Reports, and containing not less than six hundred and fifty pages each.”
“Sec. 3. The said reports shall be published under the supervision of the justices of the supreme court and the reporter, by contracts to be made and entered into by the governor, secretary of state and attorney general (who are hereby on behalf of the state constituted a commission for such purpose), of *360 the one part; and the person or persons to whom such contract shall, in the manner hereinafter set forth, be awarded, of the other part. The officers composing-said commission are authorized to make and enter into such contracts for the publication and sale of said reports, in accordance with the provisions of this act, from time to time, as occasion may require, each contract to extend for a period of ten years from the date thereof in the state of Colorado, on terms most advantageous to the state and the public, and at a rate for the publication and sale thereof, not to exceed two dollars per volume, of the size aforesaid.”
“Sec. 5. Immediately upon the taking effect of this act, the secretary of state shall advertise for proposals for the publication of said reports, for thirty (30) days, in at least two daily newspapers, of general circulation printed and published in the city of Denver. Said advertisements shall state 'the day and the hour when proposals will be opened. It shall be the duty of said governor, secretary of state and attorney general to consider all proposals for the publication of said reports, which may be made to and filed with them, on or before the time set for opening the same, and to award the contract to the person or persons who may agree to publish and sell' the same on the terms specified in section 3 of this act. ’ ’
“Sec. 6. ■ The contract must require the publisher or publishers to print and publish each volume in good law-book style, and in well-bound volumes, on good book paper, in small pica and brevier type, single leaded, equal in quality of paper and binding to volumes one, two and three of Colorado Reports, within sixty days from the time at which the manuscript of each volume is delivered by the reporter; to sell three hundred copies of each volume to the state at the price fixed in the contract; to keep on *361 hand and for sale to the public of the state of Colorado, at the price stipulated in the contract, a sufficient number of copies of each .volume to supply all demands for ten years from the publication thereof, and to give bond for the fulfillment of the terms of the contract, in the sum of ten thousand dollars, which bond shall be filed with and approved by the •secretary of state.”
By the act creating the court of appeals, the foregoing provisions were made applicable to it. — Session Laws 1891, p. 120.
No question is made as to the regularity or legality of the advertisement under which the bids were submitted. The plaintiff directs our attention to article III of the constitution, which divides the powers of government of the state into three distinct departments, namely: legislative, executive, and judicial; and to section 29 of article Y, which reads as follows:
“All stationery, printing, paper and fuel used in the legislative and other departments of government shall be furnished; and the printing and binding and distribution of the laws, journals, department reports, and other printing and binding; and the repairing and furnishing of the halls and rooms used for the meeting of the general assembly and its committees; shall be performed under contract; to be given to the lowest responsible bidder, below such maximum price and under such regulations as may be prescribed by law. No member or officer of any department of the government shall be in any way interested in any such contract; and all such contracts shall be subject to the approval of the governor and state treasurer.”
The argument based on the foregoing constitutional provision is that the meaning of the word “department” is fixed by article III; that as the *362 court of appeals belongs in tbe judicial department, its published decisions are department reports within the meaning of section 29 of article Y; that it was alleged in the complaint and admitted by the demurrer that The Banks Law Publishing Company was a responsible bidder; and that, therefore, its bid being the lowest, no room was left for the exercise of judgment or discretion by the commission, and the duty was mandatory upon it to award the contract to that company. It is further contended that the language of the statute directing the commission to make contracts for the publication of the reports on terms most advantageous to the state and the public, must be so construed as to harmonize with the constitutional requirement; and, being so construed, means simply that contracts must be given to tbe lowest responsible bidder.
A report made by a court, or by its direction, in obedience to some requirement of the law, would, without doubt, be a department report. The meaning of the word “department” is not in controversy; the question is, what were the department reports of which the constitution speaks, intended to embrace? The primary definition of the noun “report,” as given by Webster, is, an account or statement of the results of examination or inquiry made by request or direction; and by reference to the following special constitutional provisions in relation to reports, we think it clear that the word “reports,” as used in section 29 of article Y, was intended to be understood only in that sense. Section 16 of article IY, requires an account to be kept by the officers óf the executive department, and by all public institutions of the state, of all money received by them from all sources, and for every service performed, and all moneys disbursed by them severally, and that they make a semi-annual report thereof to the governor under *363 oath. Section 17 of the same article requires the same officers and institutions, at least twenty days preceding each regular session of the general assembly, to make full and complete reports of their actions to the governor, who shall transmit the same to the general assembly. In relation to the judicial department, section 27 of article VI makes it the duty of judges of courts inferior to the supreme court, on or before the 1st day of July of each year,-to report in writing to the judges of the supreme court such defects and omissions in the law as their knowledge and experience may suggest; and of the judges of the supreme court, on or before the first day of December of each year, to report in writing to the governor, for transmission by him to the general assembly, together with his message, such defects and omissions in the constitution and laws as they may find to exist, together with appropriate bills for curing the same. Since, after specifying to whom contracts for printing department reports shall be given, the constitution specially designates the officers from whom such reports are required and to whom they shall be made, and prescribes the subject-matter of the reports, it must be assumed that these are the reports contemplated by the general language of section 29, of article V.
But the latter section follows the words “department reports” with the words “and other printing and binding, ’ ’ and it is said that the latter words, in connection with those which precede them, are broad enough to include the printing and binding of the opinions of the appellate courts. But by the rule, ejusdum generis, these general words must be construed as having-reference -only to matters of .the same kind as those enumerated;' and the things to which “other printing and binding” apply, must belong in the same category with laws, journals or *364 department reports. — Hurd v. McClellan, 14 Colo. 213; Morse v. Morrison, 16 Colo. App. 449.
The final judgment of a court is never called a report; neither is the opinion giving the reasons on which the judgment is based. In appellate tribunals, when, in a given case, the court has reached its conclusion, and is ready to pronounce its judgment, some member of the court is' usually designated to prepare the opinion; but he is never said to report it. The opinion is delivered, not reported, by him. After the opinions are printed and hound in book form, the volumes containing them are denominated reports. But. the name so given is used in a special and peculiar sense. Such reports are not reports within the ordinary meaning of the term. They cannot be classed with department reports as defined by the constitution. Neither are they of the nature of laws — that is, acts of the legislature — or of journals; so that the words “other printing and binding ’ ’ would not include them.
The validity of the action of the commission in awarding the contract, must therefore be tested by the statute. Section 5 makes it the duty of the commission to award the contract to the person or persois who may agree to publish and sell the reports on the terms specified in section 3. The only terms mentioned in section 3 are, “terms most advantageous to the state and the public. ’ ’ The determination of the question, what terms are most advantageous to the state and the public, is left to the commission. Seasons may exist why, as between two bids, the interests of the state and the public demand that the higher should be preferred, each of the bidders being equally responsible. Thus the duty cast upon the commission is, in its nature, judicial. To reach a conclusion as to what terms are most advantageous to the state and the public, involves the *365 exercise of judgment; and, in the absence of fraud, the judicial discretion confided to the commission is not subject to control by the courts. — Johnson v. Sanitary District, 163 Ill. 285; Peeples v. Byrd, 98 Ga. 688; Douglass v. Commonwealth, 108 Pa. State 559; Mechem on Public Officers, § 991; Throop on Public Officers, § 849.
But the complaint alleges that, in and by its bid, The Banks Law Publishing Company proposed to print the reports in accordance with the terms of the contract as provided by statute, and as set forth in the advertisement; whereas, the bid of The Mills Publishing Company did not propose to print the reports in accordance with those terms; but contained other and different terms, in that it provided that, if the contract should be awarded to it, the work required in the performance of the contract would be done in the state of Colorado, and by union labor. The argument is that it is essential that the bidders ’ proposals should agree with the offer of the state; that in order to secure competition between them the bids should all be made upon the same terms of offer requested by the statute and the advertisement; and that, therefore, the bid of the Mills company, purporting to accept the offer of the state on terms varying from the offer, cannot be considered. To the general proposition concerning the necessity of conformity of the proposals with the offer of the state, we assent; but whether it appears from the complaint that in such respect the bid of the Mills company failed, must be determined from the averments in that pleading.
The language of the proposals is not set forth in the complaint; but the only variance alleged between the proposal of the Mills company and the offer of the state, consists in the statement that if the contract should be awarded to that company, the work *366 would be done within the state and by union labor. That its bid otherwise met the requirements of the law and responded to the advertisement, is not questioned, and must, therefore, be assumed. Now the statement objected to spoke of the contract as something distinct from itself, and of which it did not propose to become a part. What it suggested was conditioned upon the award of the contract to the Mills company. What contract? Manifestly the contract required by section 6 of the statute. It could refer to no other. It contemplated no variance from the prescribed terms of that contract. It was expressive merely of an intention which the bidder entertained respecting the course it would pursue in case the contract which the statute authorized should be awarded to it; and related not to the terms of the contract, but the place where, and the persons by whom, after its due execution, the work necessary in its performance would be done. It constituted no part of the proposal. The bidder had a lawful right to select the place where it would perform its contract, ánd to employ such labor as it might see fit for the purpose; and how an expression of an intention as to the manner in which a contract duly awarded to it should be performed could unfavorably affect its proposal, we are unable to perceive.
The cases cited in support of counsel’s position are not in point. They are of two classes: one relating to public work for the doing of which bids are called for in pursuance of law; and the other relating to offer and acceptance between private parties. A sample of the first is State v. Commissioners, 13 Neb. 57. The county clerk had advertised, pursuant to the statute, for bids for the furnishing of books, blanks and stationery to county officers, the contract to be awarded to the lowest competent bidder. The successful bidder proposed to furnish some of the *367 articles “at just what it costs to lay them down,” and certain others, “at what it cost to deliver the same to the county.” The court held that the hid did not conform to the advertisement' and .the law, in that it did not state the price at which the articles would be furnished. A sample of the second is Railway v. Rolling Mill, 119 U. S. 149. The mill offered to sell the railway from 2,000 to 5,000 tons of iron rails at $54 per gross ton for spot cash. The railway accepted the offer as to price, but restricted the amount to 1,200 tons. The court held that under the offer the railway company might take, at its election, any number of tons not less than 2,000, nor more than 5,000, on the terms specified; but that its order for 1,200 tons did not respond to the offer, and amounted in law to a rejection of it. The distinction between those cases and the case at bar is obvious.
Another objection to the action of the commission is that the award to the Mills company operated as a discrimination between different classes of citizens. It has uniformly been held that official action in relation to public work, whether by way of statute, ordinance, resolution or contract, which undertakes such discrimination, is- void. In Holden v. Alton, 179 Ill. 318, the city comptroller advertised for sealed proposals for the printing of bonds to be used by the city for street paving, under an ordinance providing that such work should be let by contract to the lowest bidder. The plaintiff was the. lowest bidder, and a printing company was next higher. A petition of a typographical union had been received asking the council to prohibit the letting of any contract for city printing to any office which could not furnish the label of the union. The printing company employed union labor, and the plaintiff did not. The council thereupon passed an ordinance providing *368 that all city printing should be awarded and let only to such printing houses as employed union labor, and in pursuance of the ordinance accepted the bid of the printing company. The court annulled the action as an attempted abuse of .power, saying, however, that “a court of equity would not review the proceedings of a city council in matters left to its discretion, where such discretion has been exercised in good faith.” In Adams v. Brenan, 177 Ill. 194, the board of education of Chicago entered into an agreement with a labor organization known as the ‘ ‘ Building Trades Council,” by which the board bound itself to insert in all contracts for work upon school buildings a provision that none but union labor should be employed in such work, and none but union workmen should be placed on the pay rolls of the board. The board afterwards advertised for bids for the construction of a roof on an addition to one of the schools, inserting in the advertisement the following notice: “None but union labor shall be employed on any part of the work where said work is classified under any existing union.” John A. Knisely submitted two bids, in one of which he agreed to do the work, and be bound by the condition named in the notice, for $2,090; and in the other offered to do the same work for $1,900, provided all conditions as to the employment of union labor were stricken from the specifications, and a contract made accordingly. The higher bid was accepted. Suit was brought by appellant, a taxpayer, to annul the contract. In its discussion of the questions presented, the court said:
“It is plain that the rule adopted by the board and included in this contract is a discrimination between different classes of citizens, and of such a nature 'as to restrict competition and to increase the cost of work. It is unquestionable that if the legislature should enact a statute containing the same pro *369 vision as this contract in regard to any work to be done for boards of education; or if they should, by a statute, undertake to require this board, as the agency of the state in the management of school affairs in the city of Chicago, to adopt such a rule or insert such a clause in its contracts, or should undertake to authorize it to do so, the provision would be absolutely null and void as in conflict with the constitution of the state. If such a restriction were sought to be enforced by any law of the state, it would constitute an infringement upon the constitutional rights of citizens, so that the state in its sovereign capacity, through its legislature, could not enact such a provision. ’ ’
No eases that we have found go any farther than the foregoing. It is to official action to enforce a preference in favor of one class of citizens to the exclusion of another, that the condemnation is directed; but the doctrine is not applicable to persons acting in their private or individual capacity. In managing their private affairs, they are at liberty to determine whom they will or will not employ. They may lawfully discriminate as they choose. It is not alleged that this commission sought to impose any condition upon bidders by which their free action in the employment of labor might be in any manner restricted. Pursuant to the advertisement, the contract to be awarded to the successful bidder was the contract prescribed, by the law; and it does not appear that any other contract .was contemplated. The commission was not responsible for the statement of one of the bidders that it would employ union labor; and if the commission believed that the proposal of such bidder was the most advantageous to the state and the public, a rejection of its bid simply because it announced an intention to do what *370 no law prohibited it from doing, would have been unwarranted.
Finally, it is said that the allegation that the contract was awarded to the Mills company because of its proposition to do the work, within the state, and to employ union labor, was admitted by the demurrer; and that the awarding of the contract for that reason, was, in itself, an act of discrimination. It is nowhere averred that, in making the award, the commission did not act in good faith. Nothing in the nature of fraud is charged against them. In Johnson v. Sanitary District, supra, it is said that in the absence of -fraud it is beyond the province of the court to control a discretion vested in public officers. We have no authority to inquire into the grounds on which this award was made. Those grounds may have been insufficient. The power of the commission to 'decide, involved the power to decide erroneously; but their decision, whether correct or not, cannot be reviewed in this proceeding. In Douglass v. Commonwealth, supra, the court said: “If the authorities act in good faith, although erroneously or indiscreetly, mandamus would not lie to compel them to modify or change their decision. ’ ’
A demurrer admits everything that is well pleaded; but a matter which the courts are debarred from considering, is not well pleaded. The complaint is no better with the allegation than it would have been without it.
We think the demurrer was properly sustained and the judgment will be affirmed.

Affirmed.

Gunter, J., not participating.