306 Ga. 301
FINALCOPY

S19A0460.  CITY OF COLLEGE PARK v. CLAYTON COUNTY et al.

MELTON, Chief Justice.

This is the second appearance of this case before this Court. In the prior appeal, *Clayton County v. City of College Park*, 301 Ga. 653 (803 SE2d 63) (2017) ("*Clayton County I*"), we characterized the controversy and set forth the facts as follows:

> In this case involving the taxation of alcoholic beverages at Hartsfield-Jackson Atlanta International Airport (the "Airport"), Clayton County appeals from the trial court's order denying its motion for judgment on the pleadings and granting the motion for partial summary judgment filed by the City of College Park. In seeking a judgment on the pleadings, Clayton County asserted, among other things, that the City of College Park's claims were barred by sovereign immunity. . . . The Airport, which is owned and operated by the City of Atlanta, is located primarily within Clayton County (the "County"). Of the many businesses located within the Airport, some are located in the unincorporated sections of the County while other businesses are located in the County within the incorporated limits of the City of College Park (the "City"). In its complaint, the City asserts that since the 1983 enactment of OCGA § 3-8-1 (regulation and taxation of alcoholic beverages at public airports), it has not been

receiving the proper amount of alcoholic beverage taxes to which it is entitled, and that the County improperly infringed on its authority to tax by instructing vendors to remit to the County 50% of the taxes due from the sale of alcohol in those portions of the Airport located within the City limits.

The City and County disagree on the interpretation of OCGA § 3-8-1 (e) in light of the articles of the Georgia Constitution relating to the taxation power of counties and municipalities. The City asserts that, pursuant to OCGA § 3-8-1 (e), only it has authority to levy and collect taxes on the sale or use of alcoholic beverages within the corporate limits of the City, while the County can only levy and collect those taxes in the unincorporated areas of the County, and that within these parameters, the parties are then entitled to an equal division of all of the alcoholic beverage tax proceeds collected. The County asserts that OCGA § 3-8-1 (e) can only be construed to provide that the County is entitled to 50% of all alcohol tax revenues derived from within the City and 100% of the tax revenues derived from the unincorporated areas of the County.

When the parties could not resolve their dispute, the City filed a complaint naming as defendants the County and two businesses that operate within the Airport, Mack II, Inc. and General Wholesale Company (the "taxpayer defendants"). The complaint sought an interlocutory and permanent injunction against the County (as well as the taxpayer defendants), and a declaratory judgment as to the City's and County's division and collection of alcoholic beverage taxes, as well as the taxpayer defendants' payment of those taxes. The complaint also asserted claims against the County for an accounting, unjust enrichment, attorney fees, and damages. The taxpayer defendants filed a counterclaim for interpleader against the City, a cross-claim for interpleader against the

County, and a petition for declaratory judgment.

The County filed a motion for judgment on the pleadings, asserting that the City's complaint and the taxpayer defendants' cross-claims fail to state a claim and are barred by sovereign immunity, laches, OCGA § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute"), and OCGA § 36-11-1 (claims against counties must be presented within 12 months after they accrue or become payable). The City moved for partial summary judgment on its claims for declaratory judgment.

Following a hearing, the trial court denied the County's motion for judgment on the pleadings, finding that sovereign immunity does not apply to the City's claims or the taxpayer defendants' cross-claims for indemnity and contribution, that the doctrine of laches does not bar the City's claims, and that to the extent the statute of limitation in OCGA § 36-11-1 applies, "it would merely limit the time window or amount of College Park's damages" and not foreclose recovery altogether. The court granted the City's motion for partial summary judgment on the declaratory judgment counts, finding that the Alcoholic Beverage Code, OCGA § 3-3-1 et seq., permits the City to impose alcoholic beverage tax only within its municipal limits and the County to impose such a tax only in the unincorporated areas of the County, that neither can impose and collect alcoholic beverage taxes within the other's taxing jurisdiction, and that the taxpayer defendants must submit tax monies only to the entity authorized to collect the funds. The court found further that once the City and the County have exercised the power to impose and collect taxes within these guidelines, OCGA § 3-8-1 (e) requires that they then remit to the other half of the collected proceeds.

(Footnotes omitted.) Id. at 653-655.

Ultimately, we vacated this judgment and remanded the case for consideration of the "threshold question of whether sovereign immunity applies at all in suits between political subdivisions of the same sovereign (like the City and the County)." Id. at 656 (2).[1]

---

[1] In doing so, we recognized that the question was a difficult one. We noted, generally:

> In deciding whether sovereign immunity applies at all in suits between political subdivisions (and whether the answer varies based on which political subdivision is the plaintiff and which is the defendant), considerations include, among other things: (1) the extent to which sovereign immunity at common law was understood (in Georgia specifically and in traditional English and American law more generally) to apply only in suits against the sovereign *by* citizens (as opposed to suits *by* subdivisions and other instrumentalities that are themselves creations of the sovereign); (2) the extent to which political subdivisions could sue one another at common law, and whether that depended on the nature of the subdivision (i.e., a county, a city, or some other entity); (3) the nature and extent of the derivative sovereign immunity afforded political subdivisions under Article I of the Constitution of 1983, as well as the nature and extent of the governmental immunity afforded political subdivisions under Article IX (to the extent, if any, that they are not coextensive), in light of the constitutional text, history, and precedents addressing each of those constitutional provisions; (4) the nature of the *constitutional* relationships among the State of Georgia itself, its counties, and its cities, including the extent to which those relationships may have changed over time (with the constitutional grant of home rule, for instance); and (5) the extent to which the General Assembly has by law indicated that disputes between political subdivisions ought to be resolved by courts, on the one hand, or by

Though the City had already filed claims for mandamus against County officials in their official capacities in its original complaint, on remand, the City amended its complaint, adding purported mandamus claims against three officials of the County in each one's individual capacity. After consideration, the trial court entered two orders. First, the trial court granted interpleader relief sought by Mack II, Incorporated and General Wholesale Company against the City and the County.[2] Eleven days later, the trial court entered an order finding that the County was entitled to sovereign immunity from all of the claims brought by the City, except its constitutional takings claim.[3] As part of this ruling, the trial court held that sovereign immunity barred all of the mandamus claims against three County officials, even in their official capacities. Based on all of these rulings, the trial court granted the County's Second Motion

---

a political or administrative process, on the other. See, e.g., OCGA § 36-1-3.

(Emphasis in original.) *Clayton County I*, supra, 301 Ga. at 657 (2) n.7.

[2] Prior to making this decision, the trial court did not consider whether the interpleader claim was barred by the doctrine of sovereign immunity.

[3] In doing so, the trial court relied specifically on *City of Union Point v. Greene County*, 303 Ga. 449 (812 SE2d 278) (2018).

for Judgment on the Pleadings, the procedural vehicle by which it raised its immunity arguments on remand.

1. There are several issues in this case, but we will start with the broadest, and perhaps most important, consideration — whether sovereign immunity applies at all to this suit between the City and the County, two political subdivisions of the sovereign State of Georgia. Considering the fundamental nature of sovereign immunity and its parameters as the doctrine was understood in Georgia at the time it became part of our State's Constitution, we conclude that sovereign immunity does not apply to bar the current lawsuit.

(a) In considering the issues in this case, we adhere to principles of Georgia constitutional interpretation. For example,

> "[w]e interpret a constitutional provision according to the original public meaning of its text," *Olevik* [*v. State*, 302 Ga. 228, 235 (2) (c) (i) (806 SE2d 505) (2017)], which requires considering its context. Where, as here, a constitutional provision incorporates a pre-existing right, the provision cannot be said to create that right — it merely secures and protects it. See *Nunn v. State*, 1 Ga. 243, 249 (1846). . . . And where the right enshrined in the constitution was one found at common law, that

constitutional right is understood with reference to the common law, absent some clear textual indication to the contrary. See *Virginia v. Moore*, 553 U.S. 164, 168 (128 SCt 1598, 170 LE2d 559) (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *United States v. Wong Kim Ark*, 169 U.S. 649, 654 (18 SCt 456, 42 LE 890) (1898) ("The language of the Constitution, as has been well said, could not be understood without reference to the common law."); *Cent. of Ga. R. Co.*, 109 Ga. [716, 728 (35 SE 37) (1900)] ("In construing a constitution, a safe rule is to give its words such significance as they have at common law; especially if there is nothing in the instrument to indicate an intention by its framers that the language in question should have a different construction.").

*Elliott v. State*, 305 Ga. 179, 212 (IV) (B) (824 SE2d 265) (2019). This principle has importance here because sovereign immunity was initially incorporated into the Georgia Constitution of 1945 by an amendment ratified in 1974. Our Constitution did not create sovereign immunity; instead, it incorporated sovereign immunity from the common law. Therefore, we must look to the understanding of the common law doctrine of sovereign immunity in Georgia by 1974 — the date at which Georgia gave the doctrine constitutional status. And, though the relevant text of our State Constitution

regarding sovereign immunity has undergone certain revisions leading up to its current form in the Georgia Constitution of 1983 as amended in 1991, those provisions generally address only the waiver of sovereign immunity.

We have previously recognized the continuous constitutional reservation of the common law of sovereign immunity, recounting that in November 1974, Georgia voters ratified an amendment adding the doctrine of sovereign immunity to the Georgia Constitution of 1945, and the 1974 amendment was carried forward into the Georgia Constitution of 1976. See Ga. Const. of 1976, Art. VI, Sec. V, Par. I. The 1974 amendment authorized the General Assembly "to create and establish a State Court of Claims with jurisdiction to try and dispose of cases involving claims for injury or damage, except the taking of private property for public purposes, against the State of Georgia, its agencies or political subdivisions, as the General Assembly may provide by law." It further provided: "Nothing contained herein shall constitute a waiver of the immunity of the State from suit, but such sovereign immunity is expressly

reserved except to the extent of any waiver of immunity provided in this Constitution and such waiver or qualification of immunity as is now or may hereafter be provided by act of the General Assembly." Later,

> [t]he doctrine of sovereign immunity retained its constitutional status in the Constitution of 1983, which provided at its adoption that "[s]overeign immunity extends to the state and all of its departments and agencies." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (as originally adopted). The Constitution of 1983, however, changed the means by which sovereign immunity could be waived. The General Assembly had never exercised its authority under the 1974 amendment to establish a State Court of Claims, see R. Perry Sentell, Jr., Local Government Tort Liability: The Summer of '92, 9 Ga. St. U. L. Rev. 405, 407 (II) (B) (1993) (hereinafter Sentell, Tort Liability), and so, the Constitution of 1983 omitted any reference to a State Court of Claims. Although it retained the principle that sovereign immunity could be waived by the Constitution itself or an act of the General Assembly, the Constitution of 1983 added that a subsequently enacted statute would waive sovereign immunity only if it "specifically provides that sovereign immunity is hereby waived and the extent of the waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (as originally

adopted). The Constitution of 1983 also waived sovereign immunity in suits for breach of a written contract, as well as in suits for monetary damages to the extent that such damages were covered by liability insurance. Id. See also Sentell, Tort Liability, supra, at 407-408 (II) (C) (discussing changes worked by Constitution of 1983). This Court recognized the Constitution of 1983 as a continuation for the State of the constitutional reservation of the sovereign immunity that had been recognized by the Georgia courts since the Founding. . . . [T]he General Assembly [later] proposed to revise Article I, Section II, Paragraph IX, see Ga. L. 1990, p. 2435, and in November 1990, the voters approved the proposal. Effective as of January 1, 1991, this constitutional amendment repealed the provision waiving sovereign immunity to the extent of liability insurance, and it added a provision that, for the first time, expressly authorized the General Assembly to enact a State Tort Claims Act, among other changes. See *Curtis v. Bd. of Regents of Univ. System of Ga.*, 262 Ga. 226, 227 (416 SE2d 510) (1992). See also Sentell, Tort Liability, supra, at 411-412, 415-423 (III). But most important for our purposes, the 1991 amendment carried forward the constitutional reservation of sovereign immunity at common law as it was understood in Georgia, using the same language as the original Constitution of 1983 to reaffirm that "sovereign immunity extends to the state and all of its

departments and agencies." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) (as amended). See also *Gilbert*[ *v. Richardson*, 264 Ga. 744, 746-747 (2) (452 SE2d 476) (1994)]. Likewise, the 1991 amendment also retained that sovereign immunity could only be waived by the Constitution itself or the General Assembly, and as to the General Assembly, only by way of a law that "specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e) (as amended). See also *Gilbert*, 264 Ga. at 748 (3).

(Footnotes omitted.) *Lathrop v. Deal*, 301 Ga. 408, 420-423 (II) (B) (801 SE2d 867) (2017).

(b) With the foregoing discussion in mind, we first look to the

extent to which sovereign immunity at common law was understood (in Georgia specifically and in traditional English and American law more generally) to apply only in suits against the sovereign by citizens (as opposed to suits by subdivisions and other instrumentalities that are themselves creations of the sovereign).

(Emphasis omitted.) *Clayton County I*, supra, 301 Ga. at 657 n.7.

This consideration has great importance to our decision, as we have

consistently recognized that sovereign immunity, as it exists in

Georgia, is a continuation of English common law as it was

understood in Georgia at the time it became part of our State Constitution. We have already considered the origins of sovereign immunity at great length in *Lathrop v. Deal*, supra.[4] There, we explained that

> [t]he doctrine of sovereign immunity has been a part of our law for more than 230 years. By the time of the War for American Independence, the doctrine was "imbedded in the common law of England." *Crowder v. Ga. Dept. of State Parks*, 228 Ga. 436, 439 (3) (185 SE2d 908) (1971). See also W. Blackstone, 1 Commentaries on the Laws of England at 235237 (1st ed. 1765). After the war was concluded, Georgia adopted the common law of England as our own, see *Tift v. Griffin*, 5 Ga. 185, 189 (1848), and with it, we adopted the doctrine of sovereign immunity. See *Crowder*, 228 Ga. at 439 (3). See also *Gilbert*, [supra,] 264 Ga. [at 745]; *Hennessy v. Webb*, 245 Ga. 329, 329 (264 SE2d 878) (1980). Following its early adoption, the doctrine would persist in Georgia as a matter of common law for nearly two centuries. See *Crowder*, 228 Ga. at 440 (3).
>
> At common law, the doctrine of sovereign immunity was broad. The State "could not, without its own express consent, be subjected to an action of any kind." *Peeples v. Byrd*, 98 Ga. 688, 693-694 (25 SE 677) (1896) ("It is hardly necessary to cite authority for the proposition that a sovereign State is not liable to suit at the instance of a citizen, unless permission to sue has been expressly granted."). See also *Eibel v. Forrester*, 194 Ga. 439, 441-

---

[4] *Lathrop* details the method and manner in which the common law doctrine of sovereign immunity became constitutional law in Georgia. That history will not be restated in full here, but it nonetheless informs our analysis.

442 (22 SE2d 96) (1942) ("Without its consent the State can not be sued at all."); *Roberts v. Barwick*, 187 Ga. 691, 694 (1 SE2d 713) (1939) ("[T]he State can not by the courts be required to submit to being sued against its express consent."); *Western Union Tel. Co. v. Western & A. R. Co.*, 142 Ga. 532, 535 (83 SE 135) (1914) ("[T]he State can not be sued, or subjected to an action of any kind, without special legislative authority."); *Brunswick & A. R. Co. v. State of Ga.*, 48 Ga. 415, 418 (1873) ("The State cannot, against the will of the Legislature, be compelled to submit its liabilities to its own Courts."); *Printup v. Cherokee R. Co.*, 45 Ga. 365, 367 (1872) ("[T]he State cannot be made a party to this suit against or without her consent. . . ."). Most commonly, the doctrine was employed to bar suits for damages and other monetary relief. See, e.g., *Roberts*, [supra,] 187 Ga. at 695-696 (2) (suit for failure of State to pay amounts owed under leases).

Even so, notwithstanding the popular, contemporary notion that sovereign immunity is principally about the protection of the public purse, see, e.g., *Martin v. Dept. of Public Safety*, 257 Ga. 300, 301 (357 SE2d 569) (1987), the doctrine at common law was understood more broadly as a principle derived from the very nature of sovereignty. See *Gilbert*, [supra,] 264 Ga. at 749 (4), n.7 ("Historically, governmental or sovereign immunity was justified as a recognition that it was a contradiction of the sovereignty of the king to allow him to be sued as of right in his own courts."). See also *Roberts*, [supra,] 187 Ga. at 694 (1) ("The sovereignty of the State is supreme, and to maintain that sovereignty[,] the supremacy must also be maintained, and to do that the State must never be subjected to suit without its expressed consent."); *Kawananakoa v. Polyblank*, 205 U. S. 349, 353 (27 SCt 526, 51 LE 834) (1907) ("A sovereign is exempt from suit, not because of any formal conception

or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." (Citations omitted)).

(Footnotes omitted.) Id. at 411-413 (II) (A). "Simply put, the constitutional doctrine of sovereign immunity forbids our courts to entertain a lawsuit against the State without its consent." Id. at 408.

This view of sovereign immunity in Georgia, of course, correlates to traditional English law and American law more generally. Again, this is because sovereign immunity in Georgia (and in American law) was adopted directly from the common law of England. The United States Supreme Court has quite recently observed:

> After independence, the States considered themselves fully sovereign nations. As the Colonies proclaimed in 1776, they were "Free and Independent States" with "full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which Independent States may of right do." Declaration of Independence Par. 4. Under international law, then, independence "entitled" the Colonies "to all the rights and powers of sovereign states." *McIlvaine v. Coxe's Lessee*, 4 Cranch 209, 212 (2 LEd 598) (1808).
> "An integral component" of the States' sovereignty

was "their immunity from private suits." *Federal Maritime Comm'n v. South Carolina Ports Authority*, 535 U.S. 743, 751-752 (122 SCt 1864, 152 LE2d 962) (2002); see *Alden v. Maine*, 527 U.S. 706, 713 (119 SCt 2240, 144 LE2d 636) (1999) ("[A]s the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . ."). This fundamental aspect of the States' "inviolable sovereignty" was well established and widely accepted at the founding. The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison); see *Alden*, supra, at 715-716, 119 SCt 2240, 144 LE2d 636 ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."). As Alexander Hamilton explained:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union." The Federalist No. 81, at 487 (emphasis deleted).

*Franchise Tax Board of California v. Hyatt*, __ U. S. __ (II) (B) (1) (139 SCt 1485, 203 LE2d 768) (2019).

So, the nature of sovereign immunity appears to be clear — the sovereign cannot be called into the courts of its own making by

private persons without the permission of the sovereign. Of course, in Georgia, we have no king. Instead, the corresponding power in our democratic republic resides in the People of Georgia. In turn, the People of Georgia established a Georgia Constitution that created a state government through which the sovereign power is exercised. See Ga. Const. of 1983, Preamble ("we the people of Georgia . . . do ordain and establish this Constitution"). See also *Yick Wo v. Hopkins*, 118 U. S. 356, 370 (6 SCt 1064, 30 LE 220) (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."). As a result, the State of Georgia is the sovereign for purposes of sovereign immunity.

This understanding of the nature of sovereign immunity, standing alone, strongly indicates that sovereign immunity has no application to the current litigation. Here, the City and the County

are merely exercising their own respective home rule powers[5] by collecting tax revenues for their own purposes, and neither the City nor the County is acting on behalf of the State of Georgia. There is no sovereignty to be maintained. There are only two political subdivisions, neither of which controls the court into which it was called or has governing authority over the other party with respect to the matter in dispute. As the doctrine of sovereign immunity is a

---

[5] Home rule is set out in Article IX, Section II of the Georgia Constitution of 1983. With regard to counties, Article IX, Section II, Paragraph I (a) provides:

> The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto. Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b). This, however, shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof. The General Assembly shall not pass any local law to repeal, modify, or supersede any action taken by a county governing authority under this section except as authorized under subparagraph (c) hereof.

With regard to cities, Article IX, Section II, Paragraph II provides:

> The General Assembly may provide by law for the self-government of municipalities and to that end is expressly given the authority to delegate its power so that matters pertaining to municipalities may be dealt with without the necessity of action by the General Assembly.

Paragraph III goes on to give counties and municipalities a number of additional supplementary powers, including such things as police and fire protection and public transportation.

"principle derived from the very nature of sovereignty," *Lathrop*, supra, it stands to reason that the doctrine would be inapplicable to a lawsuit in which there is no sovereignty to protect. Put in the simplest of terms in this case, the County is not a sovereign over the City, and the City is not a sovereign over the County. Neither entity retains a superior authority over the other that would prevent it from being hailed into a court of law by the other.

Therefore, unless applicable precedent exists that alters this fundamental nature of sovereign immunity in Georgia, sovereign immunity does not apply to the present lawsuit.

2. A review of case law reveals that political subdivisions such as counties and cities generally have been allowed to sue one another at common law, both in England and Georgia. It is important to consider the case law in this regard, as each case provides some indication of the breadth and limitations of sovereign immunity as it was understood in Georgia at the time it was made a part of the Georgia Constitution.

Political subdivisions could sue each other at common law in

England, and there does not appear to be any indication that the nature of the subdivision made any relevant difference. For example, in one such case, despite objections made by the defendants, the English court allowed "the mayor and commonality of Lincoln" to maintain a suit against "the mayor, bailiffs and commonality of Derby." 1 Stewart Kyd, A Treatise on the Law of Corporations 191 (1793), citing *Mayor of Lincoln v. Mayor of Derby*, 48 Edw. 3, 17; see also James Grant, A Practical Treatise on the Law of Corporations 193 (1854). There are a number of additional examples of political subdivisions of the crown suing each other, with no specific limitations placed on such suits. See, e.g., *Mayor of the City of London v. Mayor of the Borough of Lyn Regis*, 126 Eng. Rep. 1026 (1796); *Corp. of London v. Corp. of Liverpool*, 145 Eng. Rep. 1024 (1795) (litigation between two municipalities); *County of Worcester v. Town of Evesholm*, 90 Eng. Rep. 116 (1686) (litigation between county and town); 1 Stewart Kyd, supra, at 191-195.

Likewise, the Georgia Reports include numerous cases in which political subdivisions of the State have been allowed to sue

one another in Georgia courts. A sampling of such cases which had been decided at the time that sovereign immunity was incorporated into the Georgia Constitution in 1974 include: *Macon County v. City of Oglethorpe*, 229 Ga. 687 (194 SE2d 97) (1972) (action to enjoin construction of road); *City of Trenton v. Dade County*, 201 Ga. 189 (39 SE2d 473) (1946) (validation of revenue anticipation certificates); *City of Atlanta v. DeKalb County*, 196 Ga. 252 (26 SE2d 334) (1943) (injunction sought to prevent disconnection of water system); *Terrell County v. City of Dawson*, 172 Ga. 403 (158 SE 47) (1931) (suit to recover rents for jointly owned property); *Wilkes County v. Mayor and Council of Washington*, 167 Ga. 181 (145 SE 47) (1928) (suit to recoup cost of paving street); and *DeKalb County v. City of Atlanta*, 132 Ga. 727 (65 SE 72) (1909) (regarding change in county lines). All of these cases provide some evidence that, at the time that sovereign immunity was incorporated into our Constitution, cities and counties could sue each other in Georgia courts, without any concern of being barred by the doctrine of

sovereign immunity.[6]

On the other hand, we have not uncovered *any* precedent, and the parties have not identified any, where suits between political subdivisions of a sovereign such as cities or counties were barred by sovereign immunity.[7] So, precedent leading up to the point at which sovereign immunity became a constitutional doctrine in Georgia contains compelling evidence that counties and cities are allowed to sue each other in Georgia courts without any application of the doctrine of sovereign immunity. At the same time, there is no evidence at all that sovereign immunity was ever considered as a bar to such suits. Cases between 1974 and 1991 are to the same

---

[6] While none of these cases directly holds that sovereign immunity is inapplicable in cases such as this, they nonetheless provide data points regarding the state of the common law in 1974, when sovereign immunity became part of the Georgia Constitution of 1945. See, e.g., *Elliott*, supra, 305 Ga. at 195-202 (C) (III) (B) (considering cases decided before and in temporal proximity to adoption of a constitutional provision to determine its meaning).

[7] Contrary to the County's arguments, *City of Union Point v. Greene County*, supra, does not require us to reach a different result. In that case, we analyzed whether there had been a waiver of sovereign immunity, not whether sovereign immunity was applicable *in the first place*. We make the latter determination for the first time in the present case. To the extent that *City of Union Point v. Greene County* may be read in any way to contradict the holding of this opinion, however, that reading is disapproved.

effect. See, e.g., *Paulding County v. City of Hiram*, 240 Ga. 220 (240 SE2d 71) (1977) (dispute regarding annexation ordinances); *City of Covington v. Newton County*, 243 Ga. 476 (254 SE2d 855) (1979) (suit to recover charges for dumping of garbage in city landfill); *DeKalb County v. City of Decatur*, 247 Ga. 695 (279 SE2d 427) (1981) (dispute regarding city's obligation to pay county property taxes); *Coweta County v. City of Newnan*, 253 Ga. 457 (320 SE2d 747) (1984) (declaratory judgment action regarding control of water mains). In light of the nature of sovereign immunity, this result is not surprising.

3. Given the foregoing discussion, it becomes evident that sovereign immunity is not a bar to the current litigation between the City and the County. Neither the City nor the County is sovereign over the other with respect to the matter in dispute, and the rights of the State of Georgia are not at issue.[8] These considerations, when

---

[8] This analysis is limited to the facts of the present case. We do not reach the question of whether sovereign immunity may be applicable in any theoretical situation where a political subdivision is acting on behalf of or "in the shoes of" the State of Georgia. We also do not address other scenarios in which, for example, a city brings an action against the State or a State agency.

viewed in the context of the common law of sovereign immunity as it was interpreted in Georgia at the time that it was made a part of the Constitution, lead us to conclude that the City's claims against the County in this case are not barred by the doctrine of sovereign immunity.[9]

4. We note that, even if sovereign immunity were applicable in this matter, the trial court erred in its determination that mandamus claims brought by the City against public officials in their official capacities were barred by sovereign immunity. See *SJN Properties v. Fulton County Bd. of Assessors*, 296 Ga. 793 (2) (b) (ii) (770 SE2d 832) (2015). That is because our mandamus statute expressly authorizes claimants to seek relief against a public official "whenever . . . a defect of legal justice would ensue from [the official's] failure to perform or from improper performance" of "official duties." OCGA § 9-6-20. This amounts to a specific waiver

---

[9] Although we identified other general considerations in *Clayton County I*, including differences in Article I and Article IX of the Georgia Constitution of 1983, we conclude that they ultimately are not necessary to our analysis in this particular case, based on the facts and posture of this matter.

of sovereign immunity when public officials are sued in their official capacities. "Were we to hold otherwise, mandamus actions, which by their very nature may be sought only against public officials, would be categorically precluded by sovereign immunity." *SJN*, supra, 296 Ga. at 799 (2) (b) (ii) n.6.

On remand, the City amended its complaint to add claims against the County officials in their *individual* capacities, which the City improperly characterized as requests for mandamus. Mandamus, however, is by definition a claim against officials in their official capacities. OCGA § 9-6-20. The trial court also erred to the extent that it ruled that sovereign immunity would bar these additional claims. See *Ga. Dept. of Natural Resources v. Center for a Sustainable Coast*, 294 Ga. 593, 603 (2) (755 SE2d 184) (2014) ("Our decision today does not mean that citizens aggrieved by the unlawful conduct of public officers are without recourse. It means only that they must seek relief against such officers in their individual capacities. In some cases, qualified official immunity may limit the availability of such relief, but sovereign immunity generally will

pose no bar.") (Citation omitted.).

5. Finally, the City contends that the trial court erred by granting Mack II's interpleader claim prior to reaching a final decision on the sovereign immunity issue. Specifically, the City contends that, because sovereign immunity is a jurisdictional issue, the trial court was first required to address this issue before making any decision on the interpleader claims. We agree.

> The applicability of sovereign immunity to claims brought against the State is a jurisdictional issue. Indeed "[s]overeign immunity . . . like various other rules of jurisdiction and justiciability . . . is concerned with the extent to which a case properly may come before a court at all." *Lathrop*[, supra, 301 Ga. at 432 (III) (B)]. Therefore, the applicability of sovereign immunity is a threshold determination, and, if it does apply, a court lacks jurisdiction over the case and, concomitantly, lacks authority to decide the merits of a claim that is barred.

(Footnotes omitted.) *McConnell v. Dept. of Labor*, 302 Ga. 18, 18-19 (805 SE2d 79) (2017). Therefore, the trial court's grant of interpleader must be vacated, but may be considered again on remand along with all of the other issues in this case.

*Judgment reversed in part and vacated in part, and case remanded. All the Justices concur.*

Decided June 24, 2019.

Sovereign immunity; constitutional question. Fulton Superior Court. Before Judge Newkirk.

*Fincher Denmark, Steven M. Fincher, Winston A. Denmark; Eugene P. Smith, Jr.*, for appellant.

*Wilson, Brock & Irby, Larry M. Dingle, Kyler L. Wise; Carothers & Mitchell, Richard A. Carothers, Thomas M. Mitchell, Amy B. Cowan, Michael E. Hobbs; Evert Weathersby Houff, Kathryn E. Baird; Neal J. Quirk*, for appellees.

*Susan J. Moore, Rusi C. Patel*, amici curiae.