S10G1808. KYLE et al. v. GEORGIA LOTTERY CORPORATION et al.

(718 SE2d 801)

MELTON, Justice.

Appellants George Kyle and Frank Mankovitch (collectively Kyle) sued appellees Georgia Lottery Corporation (GLC) and Scientific Games International (SGI) asserting trademark infringement, deceptive trade practices, and breach of contract stemming from GLC's "Money Bags" lottery games of 2005 and 2007. The trial court granted GLC's motion to dismiss for lack of subject matter jurisdiction based on sovereign immunity, and alternatively granted motions for summary judgment brought by both GLC and SGI with respect to the claim of trademark infringement. Kyle appealed to the Court of Appeals, which affirmed the trial court's ruling in its entirety. Kyle v. Ga. Lottery Corp., 304 Ga. App. 635 (698 SE2d 12) (2010). This Court granted certiorari and posed the following questions: (1) Did the Court of Appeals err in finding that the Georgia Lottery Corporation was entitled to assert sovereign immunity as a bar to a suit raising claims arising outside the Georgia Tort Claims Act? and (2) Did the Court of Appeals err in finding that OCGA § 10-1-440 requires the bona fide use of a trademark to make out a claim concerning the trademark's infringement? For the reasons that follow, we affirm.

GLC was created by the General Assembly in 1992 under the authority of the Georgia Lottery for Education Act, OCGA § 50-27-1 et seq., for the purpose of marketing and selling lottery tickets to benefit state educational purposes. Pursuant to that authority, GLC began a "MONEY BAGS" lottery game in Georgia in October 1994, selling approximately 20 million tickets until it concluded the game in 1996. SGI is the company that printed and provided the lottery tickets to GLC.

In 1995 an entity created by Kyle was issued a registration for the mark "MONEYBAG$" by the Georgia Secretary of State on a

game which consisted of a marked velvet pouch containing numbered tiles to assist in randomly selecting numbers for lotto games. The registration was renewed for an additional ten-year period in April 2005. Between 1995 and 2005, Kyle sold less than 50 such games.

In late 1999 GLC planned to run the MONEY BAGS lottery again and in a routine trademark search, SGI learned of Kyle's trademark registration for the MONEYBAG$ mark. SGI contacted Kyle to obtain his consent for the use of the MONEYBAG$ logo for GLC lottery tickets. As a result, consent letters were signed by Kyle and SGI in 2000 and 2002, authorizing the latter's use of the MONEYBAG$ trademark to print 14 million tickets with sales to commence in 2000 and 2002, respectively. As a result, SGI sent clearance letters to GLC opining that GLC could use the "MONEY BAGS" name in games undertaken in those years without any danger of confusion with another mark.

In 2005 and again 2007, GLC ran its MONEYBAG$ games and in those instances, SGI printed scratch-off instant lottery tickets without obtaining permission from Kyle. In 2006 appellant Frank Mankovitch obtained exclusive distribution rights to Kyle's game but failed to market the game successfully; consequently, the game was not offered for sale in the marketplace from 2005 through 2007. Nonetheless, Kyle and Mankovitch sued GLC and SGI on a variety of legal theories, including infringement of the MONEYBAG$ trademark, and sought to recover all gross profits GLC derived from the sale of its MONEYBAG$ lottery tickets during the years 2005 to 2007 (approximately $5 million).

### Sovereign Immunity

1. Because sovereign immunity applies to state instrumentalities, GLC is entitled to assert sovereign immunity as a defense in this case. See *Miller v. Ga. Ports Auth.*, 266 Ga. 586 (470 SE2d 426) (1996); *Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715 (545 SE2d 875) (2001). In *Miller*, supra, we determined that the Georgia Ports Authority was a state agency entitled to the defense of sovereign immunity. To make this determination, we first examined a 1991 amendment to our state constitution, which provides:

> (a) The General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act, in which the General Assembly may provide by law for procedures for the making, handling, and disposition of actions or claims against the state and its departments;

agencies, officers, and employees, upon such terms and subject to such conditions and limitations as the General Assembly may provide.

. . .

(e) Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

Ga. Const. Art. I, Sec. II, Par. IX.

Next, we considered what the 1991 amendment meant by the term "agencies." We noted: "The dictionary defines the word 'agency' as a 'department or other administrative unit of the government.'" *Miller*, supra, 266 Ga. at 586 (citing Webster's Third New International Dictionary 40). We then concluded that, "[a]s the state administrative unit responsible for the state docks, the Georgia Ports Authority is a state agency entitled to sovereign immunity." Id. We went further to explain:

This interpretation comports with the General Assembly's intent in passing the 1991 amendment and the Georgia Tort Claims Act.[1] The 1991 amendment was passed to extend sovereign immunity to all state departments and agencies, regardless of insurance, and to substitute the insurance waiver provision in previous constitutions with a tort claims waiver. Acting under the authority of the 1991 amendment, the legislature enacted the Georgia Tort Claims Act to eliminate the unfairness caused by a strict application of the traditional sovereign immunity doctrine while, at the same time, limiting the state treasury's exposure to tort liability. Thus, when viewed in light of the Georgia Tort Claims Act, the purpose of the 1991 constitutional amendment was to redefine the terms of the state's waiver of its sovereign immunity in two ways: (1) it replaced the insurance waiver with the tort claims waiver; and (2) it limited the tort claims waiver to state government entities.

Unlike the constitutional amendment, however, the tort claims act leaves no ambiguity concerning the meaning

---

[1] The General Assembly created the 1991 amendment and the Georgia Tort Claims Act as a unit. As such, they may be read together to interpret meaning.

of the word "state." Under the bill as originally introduced and as passed by both houses of the General Assembly, the "State" was defined to mean all state governmental entities, regardless of their nomenclature. "State" means the State of Georgia and any of its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, and institutions, but does not include counties, municipalities, school districts, other units of local government, hospital authorities, or housing and other local authorities. By its express terms, the act clarifies that the "State" includes state authorities and instrumentalities, but not local governmental entities, for purposes of waiving sovereign immunity. *Our earlier cases distinguishing between instrumentalities of the state and state agencies are not dispositive since both instrumentalities and agencies are included in the act's definition of the state.*

(Footnote omitted; emphasis supplied.) Id. at 588.

In *Youngblood*, supra, 273 Ga. at 716 (1), we considered whether community service boards are State agencies or departments for purposes of sovereign immunity. To make this determination, we affirmed the analysis that we had set forth in *Miller*. We held:

Although we have not previously addressed this issue with regard to community service boards, we are guided by our opinion in *Miller*[, supra], in which we interpreted both Article I, Section II, Paragraph IX and the Georgia Tort Claims Act, OCGA § 50-21-20 et seq., to extend sovereign immunity to the State of Georgia, its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, and institutions. See OCGA § 50-21-22 (5), (6). Looking to the legislation creating the Georgia Ports Authority and the public purposes for which it was created, we held in *Miller* that the Georgia Ports Authority is a State agency entitled to raise the defense of sovereign immunity. *Miller*, supra at 589.

Applying the *Miller* analysis, a review of the law creating and defining community service boards clearly establishes that such boards are departments or agencies of the State charged with the public purpose of providing mental health care and services to the disabled citizens of this State. . . . Considering the public purpose for which community service boards were created, we find that the [(Gwinnett Rockdale Newton Community Service Board)] GRNCSB is a "state

department or agency" entitled to raise the defense of sovereign immunity under Article I, Section II, Paragraph IX of the Georgia Constitution.

(Footnote omitted.) *Youngblood*, supra, 273 Ga. at 716 (1).

Under this construct, GLC must be classified as an instrumentality of the State to which sovereign immunity applies. A review of the law creating GLC establishes that it is an instrumentality of the state, OCGA § 50-27-4, and that its main purpose is to generate net proceeds to be "used to support improvements and enhancements for educational purposes and programs and that such net proceeds shall be used to supplement, not supplant, existing resources for educational purposes and programs." OCGA § 50-27-2 (1). Furthermore, GLC "shall be governed by a board of directors composed of seven members to be appointed by the Governor," OCGA § 50-27-5 (a), and its net proceeds are distributed directly to the State treasury. OCGA § 50-27-13 (b) (2). Finally, GLC is "accountable to the General Assembly and to the public through a system of audits and reports." OCGA § 50-27-2 (4). Therefore, the purpose, function, and management of GLC are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality. *Miller*, supra.

Contrary to the arguments of the appellants, *Thomas v. Hosp. Auth. of Clarke County*, 264 Ga. 40 (440 SE2d 195) (1994), does not support a contrary result. *Thomas* predates *Miller* and relies on authority issued before the 1991 amendment and Georgia Tort Claims Act, and this pre-1991 authority relies explicitly on the type of reasoning *Miller* found to be nondispositive. *Thomas* unequivocally cites to and espouses "a narrow definition in determining what constitutes the state or a political division thereof, distinguishing the state and its political subdivisions from instrumentalities created by the state to carry out various functions." *Thomas*, supra, 264 Ga. at 41 (1). *Miller*, however, made clear that "[o]ur earlier cases distinguishing between instrumentalities of the state and state agencies are not dispositive since both instrumentalities and agencies are included in the [Georgia Tort Claims A]ct's definition of the state." *Miller*, supra, 266 Ga. at 588. Therefore, *Miller*, quite plainly, stated that the analysis in *Thomas* is no longer viable. Because it relies on a similar outdated analysis, *Jackson v. Ga. Lottery Corp.*, 228 Ga. App. 239, 241 (1) (a) (491 SE2d 408) (1997), is hereby overruled.[2]

---

[2] We note that, although it is not an issue which needs to be reached in this opinion, sovereign immunity cannot completely immunize a state instrumentality from all property claims. If a public taking occurs, compensation for that taking will still be required.

*Trademark Infringement*

2. The trial court determined that appellees are entitled to summary judgment as to the appellants' claim for trademark infringement based on the finding, inter alia, that appellants have not made "bona fide" use of their MONEYBAG$ mark in commerce sufficient to establish protectable rights in the mark.[3] The Court of Appeals adopted that standard in holding that "OCGA § 10-1-440 (b) requires the bona fide use of a trademark to make out a claim concerning its infringement." *Kyle*, supra at 637.

Under OCGA § 10-1-440 (a) (5), a "trademark" is defined as "any word, name, symbol, or device or any combination thereof adopted and *used* by a person to identify goods made or sold by him and to distinguish them from goods made or sold by others." (Emphasis supplied.) The statute further specifies that a trademark is "deemed to be 'used' in this state when it is placed in any manner on the goods or their containers or on the tags or labels affixed thereto and such goods are sold or otherwise distributed in this state." OCGA § 10-1-440 (b). The Georgia statute does not contain a "bona fide" use requirement. That requirement, as the Court of Appeals correctly observed, is contained in the federal statutory trademark scheme, set forth in 15 USCA §§ 1051 and 1127. *Kyle*, supra at 636. Nonetheless, the Court of Appeals went on to "[a]dopt[ ] federal precedent," id. at 637, in interpreting the Georgia statute to contain a bona fide use requirement. Although the cardinal rule of statutory construction forbids judicial construction where the language of a statute is plain and unambiguous, see generally *Six Flags Over Georgia II v. Kull*, 276 Ga. 210 (576 SE2d 880) (2003), we do not view the "bona fide use" of a trademark as interpreted by the Court of Appeals to be improper judicial construction. The Latin phrase "bona fide" has been defined by our case law as meaning " 'good faith,' nothing more, nothing less . . . [and when] used in English, common every day parlance, mean[s] precisely the same thing." *Phillips v. Dobbins*, 56 Ga. 617, 623 (1876) (Jackson, J., dissenting). Likewise, the term is defined in Black's Law Dictionary (8th ed. 2004) as "in or with good faith; honestly, openly and sincerely." Interpreting OCGA § 10-1-440 (b) to contain a bona fide use requirement is neither inconsistent with the statutory definition nor does it improperly expand the application of the statute. See *Abdulkadir v. State*, 279 Ga. 122, 124 (2) (610 SE2d 50) (2005) ("[a] court of law is not authorized to rewrite the statute by inserting additional language that would expand its application"). It merely

---

[3] Although GLC is entitled to a defense of sovereign immunity, as shown above, we must nonetheless reach this issue as it applies to SGI.

excludes from the definition of "use" any dishonest or bad faith motives on the part of the person obtaining and using a trademark — a result not inconsistent with the language of our General Assembly.[4] Accordingly, we find no error in the interpretation of OCGA § 10-1-440 (b) by the Court of Appeals.

*Judgment affirmed. All the Justices concur, except Carley, P. J., Benham and Thompson, JJ., who dissent.*

THOMPSON, Justice, dissenting.

Because I find that the majority opinion ignores the legislature's stated intent in enacting legislation to create the Georgia Lottery Corporation (GLC), and is directly contrary to longstanding precedent of this Court, I respectfully dissent to Division 1.

The majority posits that *Miller v. Ga. Ports Auth.*, 266 Ga. 586 (470 SE2d 426) (1996) and *Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715 (545 SE2d 875) (2001) control the outcome of this case and demand a finding that the GLC, as an instrumentality of the state, is entitled to the defense of sovereign immunity. In both *Miller* and *Youngblood*, it was determined that the Georgia Ports Authority and a county community service board, respectively, were created as agencies of the state and functioned in that capacity, and therefore, were entitled to assert a defense of sovereign immunity under Art. I, Sec. II, Par. IX (e) of the Georgia Constitution (sovereign immunity granted to the "state and its departments and agencies"). In making that determination, we examined the law creating those entities and the public purpose for which they were created. When we apply the same analysis to GLC, the opposite holds true. GLC was designated by our General Assembly as an instrumentality of the State, "and not a state agency," OCGA § 50-27-4, which is to function as an "entrepreneurial enterprise," OCGA § 50-27-2 (2), and is not to be dependent on the state treasury, OCGA § 50-27-32 (c).

Our decision in *Thomas v. Hosp. Auth. of Clarke County*, 264 Ga. 40 (440 SE2d 195) (1994), is more closely analogous. There we looked at the functions that the hospital authority carried out to determine whether, as an instrumentality of the state, it was entitled to sovereign immunity under Art. I, Sec. II, Par. IX (e) of our Constitution. We concluded that those functions "are simply not those functions which the doctrine of sovereign immunity was designed to protect," *Thomas*, supra at 42, nor would application of the doctrine

---

[4] Such an interpretation is also consistent with the federal counterpart to OCGA § 10-1-440, which explains "bona fide use," as follows: "[a] person . . . has a bona fide intention [to use a trademark], under circumstances showing the good faith of such person, to use a trademark in commerce." 15 USCA § 1051 (b) (1).

be necessary to protect the public purse. The same applies here.

The majority places great emphasis on the language of the 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution, suggesting that the subsections of that provision "be read together to interpret meaning." This, however, does not bolster its position that GLC is entitled to sovereign immunity. As relevant to our discussion, subsection (a) authorized legislation to provide for waiver of sovereign immunity by enactment of a Georgia Tort Claims Act (GTCA), and subsection (e) grants sovereign immunity to the state and its departments and agencies. In 1992, pursuant to the authority granted in subsection (a), the legislature enacted the GTCA, OCGA § 50-21-20 et seq., which provides a waiver of sovereign immunity for the torts of state officers and employees, including "instrumentalities" of the state, while acting within the scope of their official duties. In the same year, the legislature created the GLC under the authority of the Georgia Lottery for Education Act, OCGA § 50-27-1 et seq., specifying that the GLC is "not a state agency." OCGA § 50-27-4. Thus, with full knowledge of the 1991 amendment, the legislature intentionally included instrumentalities of the state under the GTCA, while it exempted the GLC as a state agency for constitutional protection under subsection (e). The question posed to the parties on certiorari was limited to "whether GLC was entitled to assert sovereign immunity as a bar to a suit raising claims *outside the GTCA.*" (Emphasis supplied.) Thus, the provisions of the GTCA do not control our decision, and the majority incorrectly bolsters its position by relying on the more expansive language of that Act.

For the foregoing reasons, I would answer the first question posed on certiorari in the affirmative. Thus, I would hold that the Court of Appeals erred in finding that GLC was entitled to assert sovereign immunity as a bar to a suit raising claims arising outside the GTCA.

I am authorized to state that Presiding Justice Carley and Justice Benham join this dissent.

DECIDED NOVEMBER 21, 2011.

*Merolla & Gold, Angelo T. Merolla,* for appellants.
*Samuel S. Olens, Attorney General, R. O. Lerer, Deputy Attorney General, William W. Banks, Jr., Shereen M. Walls, Senior Assistant Attorneys General, Troutman Sanders, Bradley J. Harrison,* for appellee.