**SECOND DIVISION
MILLER, P. J.,
MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 27, 2023**

# In the Court of Appeals of Georgia

A23A0344. PASS v. ATHENS HOUSING AUTHORITY a/k/a
    HOUSING AUTHORITY OF THE CITY OF ATHENS.

HODGES, Judge.

Keyron Pass sued the Athens Housing Authority, also known as the Housing Authority of the City of Athens (the "Housing Authority"), in a premises-liability, nuisance, and negligence action, asserting that a tenant of the Housing Authority shot him four times at close range at the Nellie B apartments, which the Housing Authority owns and operates. The Housing Authority filed a motion to dismiss, arguing that its sovereign immunity precluded the trial court from exercising subject matter jurisdiction. After a hearing, the trial court granted that motion, finding that the Housing Authority was a department or agency of the State protected by sovereign immunity, and that the General Assembly had not waived that immunity. Pass

appealed, arguing that the trial court erred in dismissing his claims. For the reasons that follow, we reverse.

"We review de novo a trial court's ruling on a motion to dismiss based on sovereign immunity grounds, which is a matter of law." (Citation and punctuation omitted.) *Campbell v. Cirrus Education, Inc.*, 355 Ga. App. 637, 641 (2) (845 SE2d 384) (2020); see also *James v. Ga. Dept. of Public Safety*, 337 Ga. App. 864, 867 (2) (789 SE2d 236) (2016) (holding that a trial court, when considering a motion for lack of subject matter jurisdiction based upon sovereign immunity," is not confined to the allegations of the complaint . . . [and] may receive evidence and make relevant factual findings" to determine whether it has subject matter jurisdiction).

> [S]overeign immunity was initially incorporated into the Georgia Constitution of 1945 by an amendment ratified in 1974. Our Constitution did not create sovereign immunity; instead, it incorporated sovereign immunity into the common law. . . . [T]hough the relevant text of our State Constitution regarding sovereign immunity has undergone certain revisions leading up to its current form in the Georgia Constitution of 1983 as amended in 1991, those provisions generally address only the waiver of sovereign immunity.

*City of College Park v. Clayton County*, 306 Ga. 301, 305 (1) (a) (830 SE2d 179) (2019). Further, "we have consistently recognized that sovereign immunity, as it

2

exists in Georgia, is a continuation of English common law as it ws understood in Georgia at the time it became part of our State Constitution." Id. at 307 (1) (b).

As noted above, in 1991, the Georgia Constitution of 1983 was amended. As our Supreme Court has stated,

> a majority of voters approved a constitutional amendment that provides for the waiver of the state's sovereign immunity through legislative acts. The amendment provides: (a) The General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act, in which the General Assembly may provide by law for procedures for the making, handling, and disposition of actions or claims against the state and its departments, agencies, officers, and employees, upon such terms and subject to such conditions and limitations as the General Assembly may provide. . . . (e) Except as specifically provided in this Paragraph, sovereign immunity extends to *the state and all of its* departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

*Miller v. Georgia Ports Authority*, 266 Ga. 586, 586-587 (470 SE2d 426) (1996), citing Ga. Const. Art. I, Sec. II, Para. IX; accord *Cameron v. Lang*, 274 Ga. 122, 126 (3) (549 SE2d 341) (2001) ("The doctrine of sovereign immunity, also known as governmental immunity, protects *all levels of governments* from legal action unless

3

they have waived their immunity from suit.") (emphasis supplied). Sovereign immunity extends to "all state departments and agencies, regardless of insurance[,]" *Miller*, 266 Ga. at 588 (1); likewise, "sovereign immunity applies to state instrumentalities[.]" *Kyle v. Georgia Lottery Corp.*, 290 Ga. 87, 88 (1) (718 SE2d 801) (2011).[1]

---

[1] Nearly 80 years ago and prior to the incorporation of sovereign immunity into the Georgia Constitution, our Supreme Court, specifying that "exemption from taxation is the only question presented[,]" found a housing authority to be an "instrumentality of the State[.]" The case did not touch upon sovereign immunity. See *Culbreth v. Southwest Ga. Regional Housing Auth.*, 199 Ga. 183, 189 (33 SE2d 684) (1945) (Relying upon the version of the Georgia Constitution existing at that time, and a provision of the Housing Authorities Law of 1937 that provided that housing authority property was tax exempt, the Court found that "[s]ince the Housing Authority is thus a public corporation, and is using this property exclusively for a declared public and governmental purpose, and not for private or corporate benefit or income, it is in effect an instrumentality of the State, and therefore the property is exempt from taxation to the same extent as if the legal title thereto was in the State itself or in a county or city."). Just more than a decade later, in *Knowles v. Housing Auth. of City of Columbus*, 212 Ga. 729, 729-730 (95 SE2d 659) (1956), our Supreme Court noted that "we have not had for decision the question of whether or not an action can be maintained against a housing authority for a personal injury it negligently inflicted on one of its tenants." The Court noted that the lower court rulings appealed from were "predicated on the proposition that a housing authority is an instrumentality of the State which performs governmental functions, and is therefore immune from tort actions." Id. at 730. Relying on *Culbreth*, supra, *Knowles* found that because the General Assembly gave the housing authority the right to "sue and be sued," it was subject to suit. Id. at 734. More than three decades later, *Knowles* was overruled by *Self v. City of Atlanta*, 259 Ga. 78 (377 SE2d 674) (1989), which found that the "sue and be sued" language "should be read as providing an entity with the status and capacity to enter courts, not as waiving sovereign immunity." Id. at 79-

4

As will be discussed more fully below, sovereign immunity has been applied to the state lottery corporation, the Georgia Ports Authority, a statewide charter school corporation, a multi-county community service board, and a single-county building authority, among others. Our Constitution, however, does not define what entities constitute "the state and all of its departments and agencies." Nor does it define "instrumentalities."

It is helpful, at the outset, to examine how our appellate courts' analysis of the question of how to determine which entities are state departments, agencies, or instrumentalities has evolved over time. In *Miller*, the Supreme Court of Georgia examined the 1945 act that created the Ports Authority, the powers granted to the Ports Authority, and the public purpose and responsibilities of the Ports Authority to

80 (1). These cases, to the extent that they may, in whole or in part remain good law, are not dispositive, as they pre-date the 1991 amendment to the Georgia Constitution, and the Georgia Tort Claims Act, which "act as a unit." *Kyle*, 290 Ga. at 89 (1), n. 1. See also id. at 90 (1) ("Our earlier cases distinguishing between instrumentalities of the state and state agencies *are not dispositive* since both instrumentalities and agencies are included in the [Georgia Tort Claims Act's] definition of the state.") (citation and punctuation omitted; emphasis supplied). We note also that our courts' interpretation of "instrumentality" has evolved over time. See *Holmes v. Chatham Area Transit Auth*., 234 Ga. App. 42, 44-45 (505 SE2d 225) (1998) (discussing the evolution of judicial understanding of what entities are "instrumentalities," and whether or not they were deemed to be "political subdivision[s]" of the State, including housing authorities, hospital authorities, parking authorities, and counties.").

determine whether it was an agency or department of the State entitled to sovereign immunity, concluding that it was entitled to immunity because it was a State administrative unit responsible for the State's docks. 266 Ga. at 587-588. In *Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715 (545 SE2d 875) (2001), the Supreme Court considered whether a community service board was protected by sovereign immunity. As in *Miller*, the *Youngblood* Court examined "the law creating and defining community service boards" and the "public purpose" that such boards serve of providing mental health care and services to Georgia citizens. The Supreme Court additionally mentioned this board's geographic service area – "multi-county" – and noted that it was "publicly funded[,]" although it did not address what public entity provided the funding; the Court then determined that the community service board was a "state department or agency" that could claim sovereign immunity. Id. at 716 (1).

In *Kyle*, the Supreme Court considered whether the Georgia Lottery Corporation was entitled to assert sovereign immunity. As in *Miller* and *Youngblood*, the Court again looked at the legislation creating the lottery corporation and its purpose of marketing and selling lottery tickets to benefit the State's educational system. *Kyle*, 290 Ga. at 91 (1). The Court then continued to expand its analytical

6

methodology by examining the Code sections related to the lottery corporation for indicia of the organization's management, governance, and funding. Those Code sections provide that the lottery corporation is governed by a board of directors "appointed by the Governor," that its "net proceeds are distributed directly to the State Treasury[,]" and that it is "accountable to the General Assembly and the public through a system of audits and reports." (Citations and punctuation omitted.) Id.. As a result, the *Kyle* Court found, "the purpose, function, and management of the [Georgia Lottery Corporation] are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality." Id., citing *Miller*, supra.

More recently, our Court in *Campbell* found that a charter school corporation was entitled to sovereign immunity. In so doing, this Court cited both *Miller*, 266 Ga. at 586, and *Kyle*, 290 Ga. at 90-91 (1), finding that "[u]nder a *Miller* analysis, courts are to examine (1) the legislation creating the entity, and (2) the public purposes for which it was created." *Campbell*, 355 Ga. App. at 642 (2). As in the earlier Supreme Court cases, however, this Court additionally discussed the charter school's geographic service area, recognizing that it had a "state-wide attendance zone," and discussed the authority which created it, noting that it "operates as a public school

7

under a charter that was approved by the State Charter Schools Commission. . . ." Id. at 638. The *Campbell* Court further examined how the charter school was financed and regulated, noting that "[f]unding for state charter schools is subject to appropriations by the General Assembly[,]" and that charter schools are regulated by the State Charter Schools Commission, which had the authority to approve and deny charter school petitions and terminate charter school contracts. Id. at 642 (2). Following this analysis, the *Campbell* Court found that "the purpose, function, and management of [the charter school was] indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality." Id., citing *Kyle*, 290 Ga. at 91 (1).

In its appellate brief, the Housing Authority argues that we should limit the ultimate basis of our analysis to the Supreme Court's *Miller* factors, as identified in this Court's *Campbell* opinion — that is, "(1) the legislation creating the entity, and (2) the public purposes for which the entity was created." 355 Ga. App. at 642 (2). The Housing Authority contends that this Court in *Campbell* "refused to adopt" the methodology employed in *Kyle*, in which the Supreme Court also examined whether the lottery corporation's governance was controlled by the State or a local entity, whether it was accountable to the State, and whether its finances were independent

from or connected to the State. First, our Court is not free to disapprove or ignore Supreme Court precedent; second, *Campbell*, in the same vein as *Kyle*, examined the charter school corporation's statewide attendance zone, its controlling authorities, and its funding. *Campbell*, 355 Ga. App. at 638, 642. Neither *Kyle*, which explicitly examines the entity's "purpose, function, and management," 290 Ga. at 91 (1), nor *Campbell* is inconsistent with *Miller*. The *Kyle* case elucidates the significance of these factors by placing them in the context of an examination of whether the entity at issue is "indelibly intertwined" with the State. Id. 290 Ga. at 91 (1).

1. Viewing the instant appeal through the multifaceted lens created by our courts, we turn first to the legislation creating the entity and the public purposes for which the entity was created. *Kyle*, 290 Ga. at 90-91 (1); *Campbell*, 355 Ga. App. at 642 (2). In 1937, the General Assembly passed the Housing Authorities Law, OCGA § 8-3-1 et seq. The General Assembly provided that a housing authority "shall constitute a public body corporate and politic . . .." OCGA § 8-3-4. The General Assembly recognized that throughout the State, there were "unsanitary and unsafe" dwelling accommodations in which persons of low income were forced to reside because of a shortage of safe, clean, uncrowded and affordable housing and necessitating "excessive and disproportionate expenditures of public funds" for crime

prevention, public health and safety, and fire and accident protection. OCGA § 8-3-2. Clearing out unsafe housing and building safe housing were "public uses and purposes for which public money may be spent[.]" Id.

We turn now to a more detailed examination of the housing authority's "purpose, function, and management" and whether it is "indelibly intertwined" with the State. *Kyle*, 290 Ga. at 91 (1). The Housing Authorities Law, which is essentially enabling legislation, provides that housing authorities may not transact business and have no legal power absent the invocation of local authority. As OCGA § 8-3-4 provides, housing authorities cannot exercise their power "until or unless the governing body of the city or the county . . . shall declare . . . [a] need for an authority to function in such city or county." The "governing body" of a housing authority is, in the case of a municipality or a county, each respective entity's commission/commissioners or associated legislative body. OCGA § 8-3-3 (9). Housing authority commissioners are appointed by the mayor. OCGA §§ 8-3-50 (a) (1) & (2), 8-3-51 (a) & (e). The commissioners or other local governing body determines whether it is advisable for the housing authority to exercise any power of eminent domain. OCGA § 8-3-10. Housing authorities must file annual reports of

their activities with, in the case of a city or county housing authority, for example, the city or county clerk or similar officer. OCGA §§ 8-3-3 (5), 8-3-9.

Although individual housing authorities exist throughout the State, like their management and governance, housing authorities' area of operation is, by statute, localized. A city, county, regional, or consolidated housing authority operates within its own boundaries or it may, via resolution, operate within the territorial boundaries of another localized area. OCGA § 8-3-3 (1); see also OCGA §§ 8-3-13, 8-3-14, 8-3-15. Its construction and management of its properties is likewise localized. OCGA § 8-3-7 provides that a housing authority's projects are subject to the local zoning, sanitation, and building laws or ordinances where it is situated. Because the property upon which housing authorities operates is deemed "public property used for essential public and governmental purposes[,]" in general, it is exempt from city and State taxation. OCGA § 8-3-8.

With these provisions in mind, we examine the specifics of the housing authority at issue here. In 1938, the City of Athens passed a resolution declaring the need for a local housing authority because "there exists in said City insanitary or unsafe dwelling accommodations[,]" and that slum clearance and the building of new housing "commence as soon as possible, in order to relieve un-employment[.]" The

11

resolution called on the city's mayor to "appoint a committee of five citizens to act as local authority[.]" These names were to be forwarded to the governor for approval, and the resolution was to be forwarded to the State Housing Authority.

Jack Richard Parker II, the Housing Authority's chief executive officer/executive director, deposed that the Athens Housing Authority Board of Commissioners approves the Housing Authority's actions almost exclusively, including its budget. The only exception is that the Athens-Clarke County Commission must approve the Housing Authority's exercise of eminent domain. The State, Parker deposed, has no day-to-day control over Housing Authority operations. Rather, the Housing Authority must abide by the rules of the U. S. Department of Housing and Urban Development ("HUD"). He deposed that the Housing Authority chooses its own auditor and, pursuant to federal, rather than State law, files yearly audits with the State. It also reports its bond indebtedness to the State. None of its debts and liabilities accrue either to the State or to the Athens-Clarke County Unified Government, nor has it ever made a claim or had an obligation paid from the trust fund that was created under Georgia's State Tort Claims Act. Neither the State nor the county controls the Housing Authority's budget or finances, the State provides no funding to the Housing Authority, and the Housing Authority receives no local or

State tax revenues. Rather, it is funded by federal monies from HUD and by tenant rents. Parker deposed that the Housing Authority carried insurance, as required by HUD; it obtains the insurance itself independent of the county, and it is not a participant in any State-issued insurance fund. Its insurance covers judgments up to the policy limits. It does report "local retirement issues" to the State, but its employees are not part of the State Merit System and participate in a retirement plan chosen by the local board and the Housing Authority itself. The Housing Authority serves primarily residents of Athens-Clarke County.

Based upon the foregoing, we must now determine whether the Housing Authority is an instrumentality, department, or agency of the State. As our Supreme Court has reasoned, "[t]he dictionary defines the word 'agency' as 'a department or other administrative *unit of government*.'" (Citation omitted; emphasis supplied.) *Miller*, 266 Ga. at 587. Taken in context, *Miller* clearly meant an "administrative unit of *State* government." Turning now to the factors outlined in *Miller* and *Kyle*, it is clear that the State, through its enabling legislation at OCGA § 8-3-1 et seq., views housing authorities' purpose in general as benefitting the low-income citizens of the State and saving money in terms of public safety and crime prevention. This housing authority, however, was not created by the State, although State law enabled its

13

creation. It was created by a local entity and appears to be primarily locally self-governing outside of any HUD governance. Further, it is unlike the unified, statewide, and State-intertwined entities in *Miller*, 266 Ga. at 587-588 (finding that the Georgia Ports Authority is "the state administrative unit responsible for the state docks . . . charged with the power to develop, improve, and maintain the harbors and seaports of the state") and *Kyle*, 290 Ga. at 91 (1) (holding that the Georgia Lottery Corporation's purpose is to market and sell lottery tickets to benefit an educational system serving the entire State, it is governed by a board of directors appointed by the governor and is accountable to the General Assembly and the public through a system of audits and reports, and its net proceeds go "directly to the State Treasury"). It is also unlike the charter school corporation discussed in *Campbell*, 355 Ga. App. at 638, 642 (2) (recognizing that the charter school corporation had a "state-wide attendance zone;" was operated as a public school; was regulated by and under a charter "approved by the State Charter Schools Commission," which had the power to deny school petitions and terminate contracts; and was funded subject to appropriations by the General Assembly).

The Housing Authority, by contrast, given its local operation, functional purpose, and local and HUD-based governance, does not as an entity fulfill a purpose

14

of serving citizens of the State, rather, its stated purpose in 1938 was to serve the citizens of the City of Athens and, later, to serve primarily the citizens of Athens-Clarke County. This geographic factor appears not, by itself, to be dispositive, as the Supreme Court in *Youngblood* found that community service boards established on a "multi-county level" were "agencies or departments of the State" protected by sovereign immunity. 273 Ga. at 716 (1), 717 (2). But this is not the only factor our Supreme Court considers in assessing whether an entity is "indelibly intertwined" with the State. The *Youngblood* Court also found that, unlike the Housing Authority, the community service board was "governed by other State agencies under State guidelines," and was subject to the rules and regulations of regional mental health planning units which are part of the State Department of Human Resources; the board also must comply with State personnel policies and its employees are subject to State Merit System rules. Id. at 716 (1), n. 2; see also *English v. Fulton County Bldg. Auth*., 266 Ga. App. 583, 586 (1) (597 SE2d 626) (2004) (finding that county building authority was entitled to assert sovereign immunity defense where it was established as "a body corporate and politic . . . which shall be deemed an instrumentality of the State . . . and a public corporation[,]" was authorized to issue bonds to finance only projects involving buildings or facilities intended for use as a juvenile court facility,

15

was "not a self-sufficient entity" and carried no liability insurance, meaning "any judgment entered against the Authority would cost taxpayers"). Here, the Housing Authority does not participate in a State-issued insurance fund and carries its own chosen insurance pursuant to HUD, not State or county, requirements. Its employees do not participate in the State retirement or Merit System. In *Kyle*, after reviewing the creating legislation and the purpose of the Georgia Lottery Corporation in the context of its geographic reach, its State-level governance, and its contribution to the State's coffers to benefit the statewide educational system, the Supreme Court found that "the purpose, function, and management of [the Georgia Lottery Corporation] are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality." 290 Ga. at 91 (1), citing *Miller*, supra.

Our review of the enabling legislation and the latest evolutions of our Supreme Court and Court of Appeals case law shows that, while the Housing Authorities Law certainly has the statewide purpose of creating local authorities to benefit citizens with affordable, safe housing and to reduce public safety expenditures, the Housing Authority itself, in terms of its purpose, function, and management, is not "indelibly intertwined" with the State. See *Kyle*, 290 Ga. at 91 (1). Rather, it was created by

16

local resolution of the City of Athens citizens in a localized area.[2] There is no evidence that its employees are part of the State Merit System or employment rules applicable to State workers, and the Housing Authority itself is governed not by the State but rather by local authorities. See *Holmes v. Chatham Area Transit Auth*., 234 Ga. App. 42, 43-45 (505 SE2d 225) (1998) (finding that the transit authority, although created as a "body corporate and politic" and "deemed to be an

---

[2] We recognize that at the time the Housing Authority was created, the City of Athens was an independent municipality. In 1991, the consolidated government, that is, the Unified Government of Athens-Clarke County, was formed through a charter created by the General Assembly that was then ratified by a citizen referendum. See *Athens-Clarke County v. Walton Elec. Membership Corp*., 265 Ga. 229 (454 SE2d 510) (1998) (The charter provides that the unified government "'shall be deemed to be both a municipal corporation and a county throughout the total territory of said government[;]'" this government has all the rights and powers "enjoyed by the county commission and the city mayor and city council"). The Housing Authority does not argue that it is a municipality or instrumentality thereof, so we do not address that issue. It argues briefly that it is a county, entitled to sovereign immunity as a department or agency of the State. The Housing Authority, however, does not show or meaningfully argue that it is entitled to immunity as an instrumentality, department, or agency of a county. As noted above, none of its debts and liabilities accrue to the Athens-Clarke County Unified Government, nor, as its CEO deposed, does it receive county funding or tax dollars. It is not subject to county budgetary control, and obtains its insurance independent of the county and as required by HUD. The record shows it to be largely self-governing or governed by HUD regulations rather than answerable to the county or to authorities of the consolidated government. The Housing Authority points us to nothing in the record regarding whether or not its employees are considered employees of the county or of the consolidated government. See generally *Kyle*, supra; *Youngblood*, 273 Ga. at 716 (1), n. 2; *Holmes*, 234 Ga. App. at 43-45.

17

instrumentality of the State of Georgia" was nonetheless established by local legislation and authorized to transport people "inside and outside of Chatham County," was "not subject to any control or supervision by the State of Georgia[,]" and was locally audited, and was thus a local authority and not a state governmental entity). As discussed above, the Housing Authority is funded by federal monies from HUD, and the State bears no responsibility for its debts and liabilities. Further, the Housing Authority points us to no evidence in the record, nor do we find any, indicating that a judgment against the Housing Authority would require the State to appropriate funds to satisfy that obligation. It appears that here, the Housing Authority is not intertwined with State funds. It is well-settled in our Supreme Court law that a fundamental and primary purpose of sovereign immunity "is the protection of state funds." *Georgia Dept. of Corrections v. Couch*, 295 Ga. 469, 480 (759 SE2d 804) (2014); accord *Interest of A. V. B.*, 267 Ga. 728 (482 SE2d 275) (1997).

> Even so, notwithstanding the popular, contemporary notion that sovereign immunity is principally about the protection of the public purse, see, e. g., Martin v. Dept. of Public Safety, 257 Ga. 300, 301, 357 SE2d 569 (1987), the doctrine at common law was understood more broadly as a principle derived from the very nature of sovereignty. Historically, governmental of sovereign immunity was justified as a

18

recognition that it was a contradiction of the sovereignty of the king to allow him to be sued as of right in his own courts.

(Citations and punctuation omitted.) *City of College Park*, 306 Ga. at 309 (1) (b).[3] Accord Lathrop, 301 Ga. at 413 (II) (A) ("A sovereign is exempt from suit . . . [because] there can be no legal right as against the authority that makes the law on which the right depends.") (citation and punctuation omitted). Here, the record does not show that the Housing Authority is so indelibly intertwined with the State as to invoke the protection of State sovereign immunity. "[I]t stands to reason that the doctrine of [sovereign immunity] would be inapplicable to a lawsuit in which there is no sovereignty to protect." *City of College Park*, 306 Ga. at 311 (1).

For these reasons, and the authority in *Miller* and *Kyle*, we find that the trial court erred in granting the Housing Authority's motion for summary judgment.

2. Given our foregoing decision, we need not address the issue of waiver of sovereign immunity.

---

[3] See also the dissents in *Miller*, 266 Ga. at 590, and *Kyle*, 290 Ga. at 93, (noting, respectively, that neither the liabilities of the ports authority nor of the Georgia Lottery Corporation would impact the public purse).

*Judgment reversed. Miller, P. J., and Mercier, J., concur.*