**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 27, 2023**

# In the Court of Appeals of Georgia

A23A0506. FILES v. THE HOUSING AUTHORITY OF THE
    CITY OF DOUGLAS.

HODGES, Judge.

Charles W. Files sued The Housing Authority of the City of Douglas (the "Housing Authority") and its employee, Michael W. Thomas, asserting claims of negligence and vicarious liability resulting from a traffic accident in which Files was injured when his vehicle and a city vehicle driven by Thomas collided. The Housing Authority moved for summary judgment, asserting that it was protected by sovereign immunity under the Georgia Constitution. The trial court granted that motion and dismissed all of Files' claims. Files appeals, arguing that the trial court erred in finding that the Housing Authority was entitled to sovereign immunity, and in finding

that it had not waived sovereign immunity up to $500,000. For the reasons that follow, we reverse.

> In reviewing a grant or denial of summary judgment, this Court conducts a de novo review of the evidence. To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation omitted.) *English v. Fulton County Bldg. Auth.*, 266 Ga. App. 583 (597 SE2d 626) (2004).

So viewed, the record shows that Files and Thomas were driving on President Street in Savannah in September 2019 when the Housing Authority vehicle, which was registered to the City of Douglas, collided with the vehicle Files was driving. Files sued the Housing Authority, alleging that he had been seriously injured. The Housing Authority answered and moved for summary judgment. The trial court granted the motion without a hearing, finding that the Housing Authority was "an arm of the state" pursuant to Ga. Const. Art. I, Sec. II, Para. IX entitled to sovereign immunity and that it had not waived that immunity.

> [S]overeign immunity was initially incorporated into the Georgia Constitution of 1945 by an amendment ratified in 1974. Our

2

Constitution did not create sovereign immunity; instead, it incorporated sovereign immunity from the common law. . . . [T]hough the relevant text of our State Constitution regarding sovereign immunity has undergone certain revisions leading up to its current form in the Georgia Constitution of 1983 as amended in 1991, those provisions generally address only the waiver of sovereign immunity.

*City of College Park v. Clayton County*, 306 Ga. 301, 305 (1) (a) (830 SE2d 179) (2019). Further, "we have consistently recognized that sovereign immunity, as it exists in Georgia, is a continuation of English common law as it was understood in Georgia at the time it became part of our State Constitution." Id. at 307 (1) (b).

The current version of Ga. Const. Art. I, Sec. II, Para. IX (e), as amended in 1991, provides that

Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

"The doctrine of sovereign immunity, also known as governmental immunity, protects all levels of governments from legal action unless they have waived their immunity from suit." *Cameron v. Lang*, 274 Ga. 122, 126 (3) (549 SE2d 341) (2001).

3

In addition to the State's departments and agencies, "[s]overeign immunity applies to state instrumentalities[.]" *Kyle v. Georgia Lottery Corp.*, 290 Ga. 87, 88 (1) (718 SE2d 801) (2011). Although our Constitution does not define the "departments and agencies" of the State, and our judicial understanding of "state instrumentalities" has shifted over time,[1] as will be discussed more fully below, sovereign immunity in those

---

[1] Nearly 80 years ago and prior to the incorporation of sovereign immunity into the Georgia Constitution, our Supreme Court, specifying that "exemption from taxation is the only question presented[,]" found a housing authority to be an "instrumentality of the State[.]" The case did not touch upon sovereign immunity. See *Culbreth v. Southwest Ga. Regional Housing Auth.*, 199 Ga. 183, 189 (33 SE2d 684) (1945) (Relying upon the version of the Georgia Constitution existing at that time, and a provision of the Housing Authorities Law of 1937 that provided that housing authority property was tax exempt, the Court found that "[s]ince the Housing Authority is thus a public corporation, and is using this property exclusively for a declared public and governmental purpose, and not for private or corporate benefit or income, it is in effect an instrumentality of the State, and therefore the property is exempt from taxation to the same extent as if the legal title thereto was in the State itself or in a county or city.") Just more than a decade later, in *Knowles v. Housing Auth. of City of Columbus*, 212 Ga. 729, 729-730 (95 SE2d 659) (1956), our Supreme Court noted that "we have not had for decision the question of whether or not an action can be maintained against a housing authority for a personal injury it negligently inflicted on one of its tenants." The Court noted that the lower court rulings appealed from were "predicated on the proposition that a housing authority is an instrumentality of the State which performs governmental functions, and is therefore immune from tort actions." Id. at 730. Relying on *Culbreth*, supra, *Knowles* found that because the General Assembly gave the housing authority the right to "sue and be sued," it was subject to suit. Id. at 734. More than three decades later, *Knowles* was overruled by *Self v. City of Atlanta*, 259 Ga. 78 (377 SE2d 674) (1989), which found that the "sue and be sued" language "should be read as providing an entity with the status and capacity to enter courts, not as waiving sovereign immunity." Id. at 79-

4

contexts has been applied to a lottery corporation, the Georgia Ports Authority, a charter school corporation, a multi-county community service board, and a single-county building authority, among others. The question before us is whether a city housing authority is a State agency, department or instrumentality.[2]

---

80 (1). These cases, to the extent that they may, in whole or in part remain good law, are not dispositive, as they pre-date the 1991 amendment to the Georgia Constitution, and the Georgia Tort Claims Act, which "act as a unit." *Kyle*, 290 Ga. at 89 (1), n. 1. See also id. at 90 (1) ("Our earlier cases distinguishing between instrumentalities of the state and state agencies *are not dispositive* since both instrumentalities and agencies are included in the [Georgia Tort Claims Act's] definition of the state.") (citation and punctuation omitted; emphasis supplied). We note also that our courts' interpretation of "instrumentality" has evolved over time. See *Holmes v. Chatham Area Transit Auth.*, 234 Ga. App. 42, 44-45 (505 SE2d 225) (1998) (discussing the evolution of judicial understanding of what entities are "instrumentalities," and whether or not they were deemed to be "political subdivision[s]" of the State, including housing authorities, hospital authorities, parking authorities, and counties.")

[2] The Housing Authority does not argue on appeal, nor did the trial court find, that the Housing Authority is entitled to sovereign immunity as a municipality or instrumentality of a municipality. The sovereign immunity of municipalities, at any rate, is addressed under a different constitutional article (Article IX) than the one upon which the trial court relied and the parties base their arguments (Article I). See Ga. Const. Art. IX, Sec. II, Par. IX, providing that "[t]he General Assembly may waive the immunity of counties, municipalities, and school districts by law." See also *Gatto v. City of Statesboro*, 312 Ga. 164, 166 (1), n. 3 (860 SE2d 713) (2021) (recognizing that Ga. Const. Art. I, Sec. II, Par. IX, "does not apply to municipalities"). As a result, we do not address whether a housing authority could be entitled to immunity as a municipality or instrumentality thereof.

5

The Housing Authority argues that it is inherently entitled to immunity under common law, that Georgia's current constitution delineates how sovereign immunity may be waived, and that we "should hold that housing authorities are, by default, protected by immunity and that Files must therefore establish a statutory waiver of immunity." In support of this contention, the Housing Authority points to *Lathrop v. Deal*, 301 Ga. 408, 422-424 (II) (B) (801 SE2d 867) (2017), which finds that the 1991 constitutional amendment to Ga. Const. Art. I, Sec. II, Par. IX "carried forward the constitutional reservation of sovereign immunity at common law as it was understood in Georgia," that "the doctrine of sovereign immunity was born at common law, and it was that doctrine – sovereign immunity at common law as understood traditionally by the Georgia courts – that had been reserved constitutionally," and that "the sweep of sovereign immunity under the Georgia Constitution is broad[.]" (Citations, punctuation, and emphasis omitted.) Id. It is true that our courts have recognized that

> [t]he common law doctrine of sovereign immunity, adopted by this state in 1784, protected governments at all levels from unconsented to legal actions. A 1991 amendment to the Georgia Constitution reiterates that 'sovereign immunity extends to the state and all its departments and agencies." Ga. Const. of 1991, Art. I, Sec. II, Par. IX (e).

6

*Dollar v. Olmstead*, 232 Ga. App. 520, 522 (2) (502 SE2d 472) (1998). But, contrary to the Housing Authority's contention, we still must determine – as our Supreme Court and this Court have consistently done over the course of many years – what entities, in particular, constitute State departments, agencies, or instrumentalities. Were we to fail to make such a determination, and simply find without analysis that housing authorities were State agencies, instrumentalities, or departments, we would in effect be saying that the prior case law by our appellate courts engaging in just such an analysis was merely superfluous. This we will not do.

As noted above, our Constitution does not define what entities constitute "the state and all of its departments and agencies," nor does it define state "instrumentalities."[3]

To determine whether an entity is an instrumentality, department, or agency of the State for sovereign immunity purposes, the Supreme Court of Georgia has established various standards over time. In *Miller v. Georgia Ports Auth*., 266 Ga. 586, 587-588 (470 SE2d 426) (1996), the Court examined primarily two factors: the

_____

[3] The terms "department" or "agency" have also been held to apply to "state political subdivisions and governmental entities, including the Board of Regents of the University System of Georgia and counties." (Footnotes omitted.) *Miller v. Georgia Ports Auth*., 266 Ga. 586, 589 (470 SE2d 426) (1996).

7

legislation creating the Georgia Ports Authority and the public purposes for which it was created. The *Miller* Court, however, also referenced the ports authority's geographic scope, finding that its authorizing legislation charged it with the "power to develop, improve, and maintain the harbors and seaports of *the state*." (Emphasis supplied.) Id. On those bases, the Court concluded that the ports authority was entitled to sovereign immunity because it was a State administrative unit responsible for the State's docks. In *Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715 (545 SE2d 875) (2001), the Supreme Court found that a community service board was entitled to sovereign immunity as a "state department or agency." As in *Miller*, the *Youngblood* Court examined "the law creating and defining community service boards" and the "public purpose" such boards serve by providing mental health care and services to Georgia citizens. Id. at 716 (1). The Supreme Court additionally examined the board's geographic service area – "multi-county" – and noted that it was "publicly funded" but did not address what entity provided the funding. Id.

In *Kyle*, the Supreme Court determined that the Georgia Lottery Corporation was entitled to assert the defense of sovereign immunity, again examining the legislation that created the corporation and its purpose of marketing and selling

8

lottery tickets to benefit the State's educational system. 290 Ga. at 91 (1). The Court then continued to expand its analytical methodology by examining Code sections related to the corporation regarding its economics and its governance and management. The Court found that the corporation was governed by a board of directors appointed by the governor, that its net proceeds were distributed to the State treasury, and that it was "accountable to the General Assembly and the public through a system of audits and reports." Id. As a result, the *Kyle* Court found, "the purpose, function and management of the [Georgia Lottery Corporation] are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality. *Miller*, supra." Id.

More recently, relying on both *Miller* and *Kyle*, this Court in *Campbell v. Cirrus Education, Inc.*, 355 Ga. App. 637 (845 SE2d 384) (2020) examined whether a charter school corporation was entitled to sovereign immunity. *Campbell* looked at the *Miller* factors, finding that the charter school corporation was regulated by and "operates as a public school under a charter that was approved by the State Charter Schools Commission. . . ." Id. at 638, 642 (2). *Campbell* additionally discussed the charter school's geographic service area, noting that it had a "state-wide attendance

9

zone." Id. at 638. It further examined how the charter school was financed, noting that its funding was "subject to appropriations from the General Assembly." Id. at 642 (2).

In sum, in these cases and others that will be discussed below, our courts have examined the legislation creating the entity and the public purposes of the entity. As part of that analysis and in determining whether an entity was, as outlined in *Kyle*, "indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality[,]" 290 Ga. at 91 (1), our courts have also examined whether an entity's governance and reporting were local or statewide; the geographic area in which it served the public; and its economics in terms of how, variously, its funding, its income-generation, and/or its debts and liabilities might impact the State.

We note that other cases, which will be discussed below, also examined how an entity was insured and the connections its employees had or did not have – for example, by participating in the State Merit System – with the State.

1. Viewing the instant appeal through the multifaceted lens created by our courts, we turn first to the legislation creating the entity and the public purposes for which the entity was created. *Kyle*, 290 Ga. at 90-91 (1); *Campbell*, 355 Ga. App. at

642 (2). In 1937, the General Assembly passed the Housing Authorities Law, OCGA § 8-3-1 et seq. The General Assembly provided that a housing authority "shall constitute a body corporate and politic . . .." OCGA § 8-3-4.The General Assembly recognized that throughout the State, there were "unsanitary and unsafe" dwelling accommodations in which persons of low income were forced to reside because of a shortage of safe, clean, uncrowded and affordable housing and necessitating "excessive and disproportionate expenditures of public funds" for crime prevention, public health and safety, and fire and accident protection. OCGA § 8-3-2. Clearing out unsafe housing and building safe housing were "public uses and purposes for which public money may be spent[.]" Id.

We turn now to a more detailed examination of the housing authority's "purpose, function, and management" and whether it is "indelibly intertwined" with the State. *Kyle*, 290 Ga. at 91 (1). The Housing Authorities Law, which is essentially enabling legislation, provides that housing authorities may not transact business and have no legal power absent the invocation of local authority. As OCGA § 8-3-4 provides, housing authorities cannot exercise their power "until or unless the governing body of the city or the county . . . shall declare . . . [a] need for an authority to function in such city or county." The "governing body" of a housing authority is,

11

in the case of a municipality, that city's council, commission, board of aldermen or other legislative city body. OCGA § 8-3-3 (9). Housing authority commissioners are appointed by the mayor. OCGA §§ 8-3-50 (a) (1) & (2), 8-3-51 (a) & (e). The commissioners or other local governing body determine whether it is advisable for the housing authority to exercise any power of eminent domain. OCGA § 8-3-10. Housing authorities must file annual reports of their activities with, in the case of a city housing authority such as the one at issue here, the city clerk or similar city officer. OCGA §§ 8-3-3 (5), 8-3-9.

Although individual housing authorities exist throughout the State, like their management and governance, a housing authority's area of operation is, by statute, localized. A city housing authority operates within its own city boundaries or it may, via resolution, operate within the territorial boundaries of another city. OCGA § 8-3-3 (1); see also OCGA §§ 8-3-13, 8-3-14, 8-3-15. Its construction and management of its properties is likewise localized. OCGA § 8-3-7 provides that a housing authority's projects are subject to the local zoning, sanitation, and building laws or ordinances where it is situated. Because the property upon which housing authorities operates is deemed "public property used for essential public and governmental purposes[,]" in general, it is exempt from city and State taxation. OCGA § 8-3-8.

12

Wih these provisions in mind, we examine the specifics of the housing authority at issue here. The City of Douglas created this housing authority in 1950. Its website, an exhibit in the record before us, outlines its mission "to provide safe, decent, and sanitary housing for Coffee County and our surrounding [c]ommunities." It is led by a local board of commissioners, who must be residents of Douglas and who are confirmed by the local Douglas Housing Authority council. The Board provides leadership and advocacy, sets housing policies, governs the "local housing agency," adopts the Housing Authority's operating budget, "operates within the law and according to [U. S. Department of Housing and Urban Development] regulations," approves decisions about Housing Authority programs, and authorizes the actions of the Housing Authority's executive director and designees. The website states that the Housing Authority will provide "wise stewardship of public funds[,]" but the Housing Authority points us to nothing in the record regarding the source of its public funding or who bears responsibility for its liabilities and debts. Nor does the Housing Authority point us to information regarding whether its employees participate in the State Merit System or retirement programs.[4] As a result, the Housing

---

[4] As noted above, the Housing Authority employee was driving a vehicle owned by the City of Douglas. The record contains an insurance policy issued by the the Georgia Housing Authorities Risk Retention Pool, but the policy lists no named

13

Authority points us to nothing indicating it is indelibly intertwined with the State through these factors.

Based upon the foregoing, we must now determine whether the Housing Authority is an instrumentality, department, or agency of the State. As our Supreme Court has reasoned, "[t]he dictionary defines the word 'agency' as 'a department or other administrative *unit of government*.'" (Citation omitted; emphasis supplied.) *Miller*, 266 Ga. at 587. Taken in context, *Miller* clearly meant an "administrative unit of *State* government." Turning now to the factors outlined in *Miller* and *Kyle*, it is clear that the State, through its enabling legislation at OCGA § 8-3-1 et seq., views housing authorities' purpose in general as benefitting the low-income citizens of the State and saving money in terms of public safety and crime prevention. This housing authority, however, was not created by the State, although State law enabled its creation. It was created by a local entity and is governed primarily, if not wholly, by local authorities. Further, it is unlike the unified, statewide, and State-intertwined

___

insured and the Housing Authority points us to no clauses in the 116-page policy relevant to the situation at hand. This Court will not cull the record on behalf of any party. *Benchmark Rehabilitation Partners v. SDJ Logistics, LLC*, 367 Ga. App. 203, 205 (4) (885 SE2d 224) (2023). We note that sovereign immunity extends to "all state departments and agencies, regardless of insurance[,]" *Miller*, 266 Ga. at 588 (1), although some of our appellate cases have considered insurance in terms of assessing the impact of a judgment on the public purse.

14

entities in *Miller*, 266 Ga. at 587-588 (finding that the Georgia Ports Authority is "the state administrative unit responsible for the state docks . . . charged with the power to develop, improve, and maintain the harbors and seaports of the state") and *Kyle*, 290 Ga. at 91 (1) (holding that the Georgia Lottery Corporation's purpose is to market and sell lottery tickets to benefit an educational system serving the entire State, it is governed by a board of directors appointed by the governor and is accountable to the General Assembly and the public through a system of audits and reports, and its net proceeds go "directly to the State Treasury"). It is also unlike the charter school corporation discussed in *Campbell*, 355 Ga. App. at 638, 642 (2) (recognizing that the charter school corporation had a "state-wide attendance zone;" was operated as a public school; was regulated by and under a charter "approved by the State Charter Schools Commission," which had the power to deny school petitions and terminate contracts; and was funded subject to appropriations by the General Assembly).

The Housing Authority, by contrast, given its local operation, functional purpose, and governance, does not as an entity, fulfill a purpose of serving citizens of *the State* – rather, its purpose is to serve the citizens of the City of Douglas, Coffee County, and nearby environs. The locality of this geographic factor appears not, by itself, to be dispositive, as the Supreme Court in *Youngblood* found that community

15

service boards established on a "multi-county level" were "agencies or departments of the State" protected by sovereign immunity. 273 Ga. at 716 (1), 717 (2). But this is not the only factor our Supreme Court considers in assessing whether an entity is indelibly interwined with the State. The Court also found that, unlike the Housing Authority, the community service board was "governed by other State agencies under State guidelines," and was subject to the rules and regulations of regional mental health planning units which are part of the State Department of Human Resources; the board also must comply with State personnel policies and its employees are subject to State Merit System rules. Id. at 716 (1), n. 2; see also *English*, 266 Ga. App. at 586 (1) (finding that county building authority was entitled to assert sovereign immunity defense where it was established as "a body corporate and politic . . . which shall be deemed an instrumentality of the State . . . and a public corporation[,]" was authorized to issue bonds to finance only projects involving buildings or facilities intended for use as a juvenile court facility, was "not a self-sufficient entity" and carried no liability insurance, meaning "any judgment entered against the Authority would cost taxpayers"). Here, it is not entirely clear how the Housing Authority is insured or whether any insurance is linked to the State, and there is no evidence that its employees are connected to the State via the merit system, their retirement plans,

16

or any other rules affecting State workers. In *Kyle*, after reviewing the creating legislation and the purpose of the Georgia Lottery Corporation in the context of its geographic reach, its State-level governance, and its contribution to the State's coffers to benefit the statewide educational system, the Supreme Court found that "the purpose, function, and management of [the Georgia Lottery Corporation] are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality." 290 Ga. at 91 (1), citing *Miller*, supra.

Our review of the enabling legislation and the latest evolutions of our Supreme Court and Court of Appeals case law shows that, while the Housing Authorities Law certainly has the statewide purpose of creating local authorities to benefit citizens with affordable, safe housing and to reduce public safety expenditures, the Housing Authority itself, in terms of its purpose, function, and management, is not "indelibly intertwined" with the State. See *Kyle*, 290 Ga. at 91 (1). Rather, it was created by the City of Douglas, to benefit, according to its website, citizens in a localized area. There is no evidence that its employees are part of the State Merit System or employment rules applicable to State workers, and the Housing Authority itself is governed not by the State but rather by local authorities. See *Holmes v. Chatham Area Transit Auth.*, 234 Ga. App. 42, 43-45 (505 SE2d 225) (1998) (finding that the

17

transit authority, although created as a "body corporate and politic" and "deemed to be an instrumentality of the State of Georgia" was nonetheless established by local legislation and authorized to transport people "inside and outside of Chatham County," was "not subject to any control or supervision by the State of Georgia[,]" and was locally audited, was thus a local authority and not a state governmental entity). The record does not reveal the source of the Housing Authority's funding or what entity is responsible for its debts and liabilities or whether those financial aspects are intertwined with the State. Further, the Housing Authority points us to no evidence in the record, nor do we find any, indicating that a judgment against the Housing Authority would require the State to appropriate funds to satisfy that obligation. It is well-settled in our Supreme Court law that a fundamental and primary purpose of sovereign immunity "is the protection of state funds." *Georgia Dept. of Corrections v. Couch*, 295 Ga. 469, 480 (759 SE2d 804) (2014); accord *Interest of A. V. B.*, 267 Ga. 728 (482 SE2d 275) (1997). It appears that here, the Housing Authority is not intertwined with State funds.

> Even so, notwithstanding the popular, contemporary notion that sovereign immunity is principally about the protection of the public purse, see, e. g., *Martin v. Dept. of Public Safety*, 257 Ga. 300, 301, 357 SE2d 569 (1987), the doctrine at common law was understood more

> broadly as a principle derived from the very nature of sovereignty. Historically, governmental or sovereign immunity was justified as a recognition that it was a contradiction of the sovereignty of the king to allow him to be sued as of right in his own courts.

(Citations and punctuation omitted.) *City of College Park*, 306 Ga. at 309 (1) (b).[5] Accord *Lathrop*, 301 Ga. at 413 (II) (A) ("A sovereign is exempt from suit . . . [because] there can be no legal right as against the authority that makes the law on which the right depends.") (citation and punctuation omitted). Here, the record does not show that the Housing Authority is so indelibly intertwined with the State as to invoke the protection of State sovereign immunity. "[I]t stands to reason that the doctrine [of sovereign immunity] would be inapplicable to a lawsuit in which there is no sovereignty to protect." *City of College Park*, 306 Ga. at 311 (1). For these reasons, and the authority in *Miller* and *Kyle*, we find that the trial court erred in granting the Housing Authority's motion for summary judgment.

2. Given our foregoing decision, we need not address Files' other enumerations of error, nor do we need to address the issue of waiver of sovereign immunity.

---

[5] See also the dissents in *Miller*, 266 Ga. at 590, and *Kyle*, 290 Ga. at 93 (noting, respectively, that neither the liabilities of the ports authority nor of the Georgia Lottery Corporation would impact the public purse).

*Judgment reversed. Miller, P. J., and Mercier, J., concur.*